John MacGUIRE, Appellant
(Plaintiff below),

v.

HARRISCOPE BROADCASTING CO., an Illinois Corporation dba KTWO Radio and Television, Jack Rosenthal and Robert Price, Appellees (Defendants below).

Neil McMURRY, Appellant
(Plaintiff below),

v.

HARRISCOPE BROADCASTING CO., an Illinois Corporation dba KTWO Radio and Television, Jack Rosenthal and Robert Price, Appellees (Defendants below).

Nos. 5051, 5052.

Supreme Court of Wyoming.

May 14, 1980.

Daniel M. Burke of Burke & Horn, Casper, for appellants.

Wm. H. Brown and Claude W. Martin of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for appellees.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

THOMAS, Justice.

The question presented in this appeal is the application of the actual-malice rule promulgated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964), in connection with a motion for summary judgment by the broadcaster of the allegedly defamatory material. The actions of the plaintiffs were premised upon some six editorials broadcast by the defendants over both television and radio in July, August, September and December of 1976. (Transcripts of these editorial comments are appended as Appendices A through F of this opinion.) The district court granted the motions for summary judgment filed by the broadcasting company and the individual defendants. It reached its decision by analyzing the record to determine if there was present, under the appropriate standard, evidence from which the finder of fact might conclude that the allegedly false statements were made with actual knowledge of the falsity or reckless disregard as to the falsity. It concluded that the material presented to the court on the record was not sufficient under the applicable standard to establish a prima facie case. We shall affirm the judgment of the district court.

In processing their joint appeals John MacGuire and Neil McMurry state the issue presented for review as follows:

"Whether the evidence, taken in the light most favorable to Appellants and drawing all reasonable inference therefrom could establish by a preponderance of the evidence that the statements were libelous statements of and concerning the Appellants and could establish with convincing clarity that the statements were published with actual malice."

The appellees state the question in this appeal as follows:

"Is there any evidence in the record that proves the defendants-appellees in fact entertained serious doubts as to the truth of the facts upon which KTWO editorialized?"

These respective statements of the issue by the parties encompass an appropriate capsulization of the applicable rules.

We shall begin with a summary of the pertinent law. The rule promulgated by the Supreme Court of the United States in *New York Times Co. v. Sullivan*, supra, has been espoused by this Court in *Phifer v. Foe*, Wyo., 443 P.2d 870 (1968), and *Adams v. Frontier Broadcasting Company*, Wyo., 555 P.2d 556 (1976). In *Adams v. Frontier Broadcasting Company*, supra, we recognized and applied the concept that the best procedural protection for freedom of speech, or of the press, the constitutional rights the rule with respect to actual malice was designed to protect, is to be found in the remedy of summary judgment which the courts have utilized freely in such cases. It is said to be the most appropriate remedy in order to minimize the chilling effect of litigation and the associated expense and inconvenience surrounding that litigation upon the exercise of the First Amendment rights. *Adams v. Frontier Broadcasting Company*, supra, at page 566; *Southard v. Forbes, Inc.*, 588 F.2d 140 (5th Cir. 1979).

For convenience we reiterate the rule set forth in *New York Times Co. v. Sullivan*, supra:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not. * * * "

In *Adams v. Frontier Broadcasting Company*, supra, we also adopted and applied the definition set forth in *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), of reckless disregard of whether the statement was false or not as follows:

"There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

This test has been stated in the alternative as the subjective awareness on the part of the publisher of the probable falsity of the published information. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In the period of time since *Adams v. Frontier Broadcasting Company*, supra, was decided the rule of *New York Times Co. v. Sullivan*, supra, and its progeny has not changed in any significant way. E. g., *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3rd Cir. 1979); *Southard v. Forbes, Inc.*, supra; *Manuel v. Fort Collins Newspapers, Inc.*, Colo.App., 599 P.2d 931 (1979); *Bandelin v. Pietsch*, 98 Idaho 337, 563 P.2d 395 (1977); *Madison v. Yunker*, Mont., 589 P.2d 126 (1978).

■ These are the legal standards relating to actual malice which are applicable to the right of either MacGuire or McMurry to recover judgment against the defendants, the appellees in our court. It is with respect to the application of these standards that the parties have joined issue in this appeal. The application of these concepts when a motion for summary judgment is presented to the court leads to an analytical method which is somewhat different from that in the usual case. The court must, of course, analyze the record to determine if there are any issues of material fact. *Weaver v. Blue Cross-Blue Shield of Wyoming*, Wyo., 609 P.2d 984 (1980); *Johnson v. Soulis*, Wyo., 542 P.2d 867 (1975). It then should examine the facts in the light most favorable to the plaintiff, and give the plaintiff the benefit of any inferences that reasonably may be drawn from those facts. *Weaver v. Blue Cross-Blue Shield of Wyoming*, supra; *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir. 1970); *Buchanan v. Associated Press*, 398 F.Supp. 1196 (D.D.C.1975). The court then must arrive at a conclusion as to whether the facts as so analyzed would justify a conclusion in a trial to a jury, or by the court sitting without a jury, that the plaintiff had established a prima facie case of actual malice. More directly the question is whether on the basis of the evidence included in the record for purposes of the motion for summary judgment the finder of fact, under a standard of convincing clarity, could conclude that the "defamatory" information had been published with knowledge that it was false or that the defendant in fact entertained serious doubts as to the truth of the publication. *Adams v. Frontier Broadcasting Company*, supra; *United Medical Laboratories v. Columbia Broadcasting System, Inc.*, 404 F.2d 706 (9th Cir. 1968), cert. den. 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Buchanan v. Associated Press*, supra; *Manuel v. Fort Collins Newspapers, Inc.*, Colo.App., 599 P.2d 931 (1979); *Kidder v. Anderson*, La., 354 So.2d 1306 (1978); *Chase v. Daily Record, Inc.*, 83 Wash.2d 37, 515 P.2d 154 (1973). We believe the trial court was on sound ground when it indicated that the failure of the appellants to produce information which would establish such a prima facie case if presented in a trial led to the granting of a motion for summary judgment by the court. It follows in a case such as this, that even though there may be issues of fact disclosed by the record, if the version claimed by the plaintiff does not satisfy the standard of convincing clarity that precludes any such issue

of fact from being an issue of a material fact, and the court still would grant the motion for summary judgment. *Bandelin v. Pietsch*, supra. See *Adams v. Frontier Broadcasting Company*, supra; *United Medical Laboratories v. Columbia Broadcasting System, Inc.*, supra; *Buchanan v. Associated Press*, supra; *Tagawa v. Maui Publishing Company*, 50 Hawaii 648, 448 P.2d 337 (1968); *Chase v. Daily Record, Inc.*, supra.

■ Of course, as the case comes before us, as we have said many times, we have substantially the same task as the trial court. We must analyze the information in the record to determine whether there are any issues of material fact which require a trial. In reaching that determination we must decide whether the information which is either undisputed or with respect to which we adopt the plaintiff's version together with the reasonable inferences to be drawn therefrom would permit a trial judge to submit this case to a jury pursuant to an instruction that actual malice must be established with convincing clarity. *Adams v. Frontier Broadcasting Company*, supra. We now shall review the information upon which our conclusion to affirm the district court is based.

Both MacGuire and McMurry admit that they are public officials for purposes of invoking the rule of *New York Times Co. v. Sullivan*, supra. MacGuire served as a member of the Natrona County Airport Board from July 1, 1971, through the period covered by the accused editorials. He was president of the board from about 1973 to July 1, 1976. McMurry served as a member of the Natrona County Airport Board from 1974 through the period of the accused editorials.

The primary focus of the editorials which led to the filing of these defamation cases is upon the lease of a hangar at Natrona County Airport by MacGuire. MacGuire actually signed the lease as President of Natrona Service, Inc., which is a corporation controlled by MacGuire and his wife. MacGuire testified in his deposition that he and his wife were partners in the operation of the corporation. The lease is dated April 12, 1976, to become effective April 15, 1976, and the premises covered are designated as Hangar No. 1 plus some space around that hangar. The hangar is described as comprising 9,760 square feet for which the lessee was to pay 3 cents per square foot per month, or $292.80. The lease provided:

"The leased premises shall be utilized as a facility for storage of aircraft, office space and a maintenance facility."

In addition to storing aircraft there, MacGuire used the hangar in connection with the operation of the uranium claim-staking business of Natrona Service, Inc.

Hangar No. 1 had earlier been leased to Sealy Flying Service. That lease agreement became effective on February 1, 1967, although it was executed on April 5, 1967. The consideration for that lease was 1¾ cents per square foot per month, and in it 12,570 square feet of floor space was ascribed to Hangar No. 1. The Sealy Flying Service lease also covered Hangar No. 5. Beginning about 1972 MacGuire occupied space in Hangar No. 5, and he later arranged with a sublessee from Sealy Flying Service to move to Hangar No. 1 and to give up the space he was using in Hangar No. 5. The rental paid to Natrona County Airport for Hangar No. 1 up until the time of the lease with Natrona Service, Inc., was computed on the basis of the lease to Sealy Flying Service, Inc. That lease, however, was terminated during the intervening period, and from that point until the execution of the April 1976 lease with Natrona Service, Inc., MacGuire occupied Hangar No. 1 on a month-to-month basis pursuant to what was described as an oral lease. The record also discloses that the rental for other leases which served as establishments for public aviation included a requirement that they pay 4 cents per gallon for aviation fuel sold to others or loaded on their own aircraft. This requirement was not a part of the lease to MacGuire.

With respect to some other aspects of the case, minutes of the meetings of the airport board reflect that the board decided that the airport would no longer provide labor

for improvements to their tenant businesses on a basis of materials being furnished by the tenant and labor being furnished by the airport. The policy was not conclusive, however, permitting exceptions in special circumstances. Other minutes of the airport board disclose that Mr. MacGuire stated a concern about wiring in the hangars, and at that meeting there were presented two light fixtures that were apparently worn out and beyond repair. There was dialogue about re-wiring the hangars because they were unsafe, and a survey by an electrical engineer was authorized. That survey resulted in an estimate of $179,000, and at that juncture the matter was tabled pending information about whether the Occupational Safety and Health Administration could require such action.

The minutes of the airport board also disclose an executive session following which a motion was made, seconded and adopted that "Doc" Stuckenhoff be awarded the farming concession for one year. That was apparently the subject of the discussion in executive session, and the decision was reaffirmed at the board meeting the month following. As a product of the controversy generated by the television and radio editorials and other publicity, a grand jury was convened in Natrona County, and its report included, among other things, a reference to the haying contract and a comment that it should not have been awarded in executive session.

The grand jury report also discussed the sale of water to Dr. Stuckenhoff for domestic purposes. It concluded that there was no impropriety on the part of the airport with regard to the sale of water. The same report noted that there were instances in the past of improper use of gasoline and borrowing of equipment on the part of airport employees. The conclusion of the grand jury was that those practices had been satisfactorily corrected. The grand jury also found that there had been work performed on the Stuckenhoff water line by airport employees but that he had offered to pay for that work and had never been billed. It further found that there had been no recent violations of the agreement on the water line which required Dr. Stuckenhoff to maintain it at his own expense. In addition the grand jury minutes did consider the matter of the hangar leases by John MacGuire and found that they were approved in executive session, which was remedied by the ratification of the motions at subsequent open meetings. The comments of the defendants-appellees with respect to these matters are reflected in Appendices A through F.

The amended complaints of MacGuire and McMurry are essentially identical in many respects. In the respective amended complaints the plaintiffs did specify particular language from the texts of the several editorials upon which they based particular counts of alleged defamation. McMurry included in his complaint some 17 counts of alleged defamation, and MacGuire included in his complaint 27 such counts. The accused language in these several counts reads as follows:

"Even after it became known to the Airport Board and the Natrona County Commissioners that K–2 was investigating an apparent conflict of interest, a new ten-year lease was granted MacGuire's personal corporation, though his previous lease would not have expired until January 31, 1977." (See Appendix A)

COUNT I, MacGUIRE
AMENDED COMPLAINT

COUNT I, McMURRY
AMENDED COMPLAINT

"If what Mr. MacGuire and others are doing at the airport in mixing their personal business with that of the public is not against the law, it ought to be." (See Appendix A)

COUNT II, MacGUIRE
AMENDED COMPLAINT

COUNT II, McMURRY
AMENDED COMPLAINT

"On July 13, KTWO charged in an editorial, that a member of the County Airport Board, John

COUNT III, MacGUIRE
AMENDED COMPLAINT

MacGuire, was mixing his personal business with that of the public by leasing a 12,000 square foot hangar from his own board at rates far below the local market." (See Appendix B)

".   .   .   Rentals charged to that corporation are far below what would be asked for comparable space elsewhere in the community. The hangar is being used primarily for a mineral claim staking business rather than as a public aircraft flying service, the intended purpose of the building, and the latest lease acknowledges this." (See Appendix A)

COUNT III, McMURRY
AMENDED COMPLAINT

"As the result of further investigation, K–2 now is prepared to state that the new ten year lease the Airport Board granted in April to its then President MacGuire would seem to be depriving the taxpayers of Natrona County of a least $12 thousand dollars a year in potential income, or a total of $120 thousand dollars if conditions remain unchanged.

COUNT IV, MacGUIRE
AMENDED COMPLAINT

COUNT IV, McMURRY
AMENDED COMPLAINT

".   .   .   Elsewhere in the Casper area, the going rate even for dead storage space is more in the area of 20 cents per square foot.  That is more than 600 percent higher than MacGuire is paying on his sweetheart deal.  The Airport Board will never know precisely how much it is giving away.   .   ." (See Appendix B)

"The problem here goes well beyond that of a county board member engineering himself a good deal at the public's expense." (See Appendix B)

COUNT V, MacGUIRE
AMENDED COMPLAINT

"The big bone of contention is the conflict of interest involving the hangar lease of Airport Board member John MacGuire.   .   .   ." (See Appendix C)

COUNT VI, MacGUIRE
AMENDED COMPLAINT

"A previous K–2 editorial pointed out that MacGuire's 'sweetheart deal' would cost the taxpayers of Natrona County at least one hundred thousand dollars in lost potential income based upon the going rate for such space in Casper." (See Appendix C)

COUNT VII, MacGUIRE
AMENDED COMPLAINT

COUNT V, McMURRY
AMENDED COMPLAINT

"The Airport Board has tried to save face for its 3 cents per square foot giveaway to MacGuire by saying the price is in line with what some other airports in the region are charging   .   .   . Anything less than that is a breach of public trust on the part of the Airport Board.  If there is any question in their minds, let them go out and try to lease space and find out on an open competitive basis what the Casper rental market is like." (See Appendix C)

COUNT VIII, MacGUIRE
AMENDED COMPLAINT

COUNT VI, McMURRY
AMENDED COMPLAINT

"Then there's the matter of MacGuire's space being 12,570 square feet rather then 9,760 square feet for rent computing purposes   .   .   .

COUNT IX, MacGUIRE
AMENDED COMPLAINT

However, K-2 learned that MacGuire's payment was a mere token since he has been receiving the benefit of the free space not just for three months, but actually for a number of years. As of last week, the bulk of his rent underpayment had not been collected by the Airport Board." (See Appendix C)

COUNT VII, McMURRY
AMENDED COMPLAINT

"This leads us back to the matter of mixing one's personal business with that of the public and the conflict of interest that results. As for the miscalculated rent, one can see how terribly, awfully awkward it must be for Airport Manager George to put the arm on the man who signs his paycheck. When serving two masters, it's usually the public master which gets the short end of the stick." (See Appendix C)

COUNT X, MacGUIRE
AMENDED COMPLAINT

"K-2 is determined to see that the property is operated in the best interests of the general public, not just for a special few. We hope there are enough men of conscience serving on the Airport Board Tuesday to outvote those whose shameful disregard of ethical conduct has evoked the public's indignation. Airport leases must be granted openly and cleanly with an equal opportunity for all." (See Appendix C)

COUNT XI, MacGUIRE
AMENDED COMPLAINT

COUNT VIII, McMURRY
AMENDED COMPLAINT

"Any remaining doubt as to whether the public was being ripped-off as the result of hangar rental irregularities by the Natrona County Airport Board should have been settled by last week's meeting." (See Appendix D)

COUNT XII, MacGUIRE
AMENDED COMPLAINT

COUNT IX, McMURRY
AMENDED COMPLAINT

". . . Airport Board member John MacGuire will receive more than $100 thousand dollars in taxpayer subsidy for his private business. . ." (See Appendix D)

COUNT XIII, MacGUIRE
AMENDED COMPLAINT

COUNT X, McMURRY
AMENDED COMPLAINT

"It means some of the extra 1% tax you pay on groceries may be going directly into the Airport Board member's personal pocket." (See Appendix D)

COUNT XIV, MacGUIRE
AMENDED COMPLAINT

COUNT XI, McMURRY
AMENDED COMPLAINT

"By refusing to collect the years of back rent owed the county by Mr. MacGuire and refusing to charge prevailing rates for space in the face of conflict of interest questions, the Airport Board is burning the public's money in the streets. If they insisted upon a fair price for Mr. Mac-Guire's building rental, it might not be necessary to ask the taxpayers to pony up that amount." (See Appendix D)

COUNT XV, MacGUIRE
AMENDED COMPLAINT

COUNT XII, McMURRY
AMENDED COMPLAINT

". . . Mr. MacGuire's abuse of an appointed position for his own personal gain, . . ." (See Appendix D)

COUNT XVI, MacGUIRE
AMENDED COMPLAINT

"Two of the three County Commissioners will be appearing on the General Election Ballot this year. County Commissioner Chairman John

COUNT XVII, MacGUIRE
AMENDED COMPLAINT

Burke, Mr. MacGuire's staunchest ally, is seeking another four year term. Commissioner Vern Rissler, without giving up his present commissioner's position, has decided to make his talents available to the State Senate. Both of these candidacies can serve as a referendum as to whether the people of Natrona County want public officials to intermingle their personal pocketbooks with the public cash drawer.

"K–2 has presented hard, cold evidence to prove that this is exactly what has happened. Not a single fact that we have presented to the public has been refuted. Repeatedly, we have offered freetime to those involved, but to no avail.

"The situation must be cleaned up and it's up to the people." (See Appendix D)

". . . there has been self-dealing practiced by a member of the Airport Board." (See Appendix E)

COUNT XVIII, MacGUIRE
AMENDED COMPLAINT

". . . those who have used their public position for personal gain. . ." (See Appendix E)

COUNT XIX, MacGUIRE
AMENDED COMPLAINT

"A reporter asked Mr. MacGuire a question regarding his accountability to the public. The response of this public servant was 'screw 'em.' Well indeed he has, and the answer merely confirmed an attitude that hardly is in keeping with open and clean government." (See Appendix D)

COUNT XX, MacGUIRE
AMENDED COMPLAINT

"Member MacGuire in a June meeting of the Board participated in and actually led a discussion which could result in the expenditure of $179 M in taxpayer funds for the improvement of his and other airport hangars, even though his lease says that such improvements are his private responsibility. If the Airport Board were to spend $179 M on the five hangars proportionately, the cost of the work of the MacGuire hangar would be $36,000. Under those circumstances, the $3,500 per year rental fee MacGuire pays would barely cover the interest, and would not pay off the investment. Therefore, if the taxpayers were to invest further into the board member's private business through the improvement of his leased hangar, it would be the same as giving him free rent at the taxpayer's expense." (See Appendix A)

COUNT XXI, MacGUIRE
AMENDED COMPLAINT

"An examination of the lease also reveals that Mr. MacGuire is not required to pay the Airport Board the same additional rental of 4 cents per gallon for aviation fuel as do the lessees of the other four hangars." (See Appendix A)

COUNT XXII, MacGUIRE
AMENDED COMPLAINT

COUNT XIII, McMURRY
AMENDED COMPLAINT

"Although Mr. MacGuire and his buddies on the County Airport Board made it so difficult to gain

COUNT XXIII, MacGUIRE
AMENDED COMPLAINT

access to the public records in their possession, that our attorneys had to threaten suit under the Wyoming Open Records Law, K–2 has enough information now to conclude that the operation of the Airport Board is shabby and disgraceful and must be cleaned up." (See Appendix A)

COUNT XIV, McMURRY
AMENDED COMPLAINT

"K–2 believes that the County Commissioners, by reappointing Mr. MacGuire, in any capacity have contributed to a situation which is nothing short of self-dealing and conflict of interests. (See Appendix A)

COUNT XXIV, MacGUIRE
AMENDED COMPLAINT

"K–2 believes that by issuing a blanket endorsement of MacGuire's actions, the County Commissioners have set an ethical standard that is too low for the people of Natrona County to accept." (See Appendix B)

"Coupled with the news of the illegal award of haying contracts and the grant of special water privileges to members of 'The Airport Club' . . ." (See Appendix A)

COUNT XXV, MacGUIRE
AMENDED COMPLAINT

COUNT XV, McMURRY
AMENDED COMPLAINT

"K–2 also has learned that the Airport Board in the past has permitted the use of county employees labor for the repair of buildings under lease at no charge to the lessees, and that the CPA firm which examined the airport books last year said that the Board's bookkeeping was at variance with generally accepted accounting principles." (See Appendix A)

COUNT XXVI, MacGUIRE
AMENDED COMPLAINT

COUNT XVI, McMURRY
AMENDED COMPLAINT

"The people of Natrona County are entitled to county boards that are operated in an open and clean manner. They should not be packed with buddies and business associates of the County Commissioners." (See Appendix A)

COUNT XXVII, MacGUIRE
AMENDED COMPLAINT

COUNT XVII, McMURRY
AMENDED COMPLAINT

---

We treat with the appeal under *New York Times Co. v. Sullivan*, supra, since this is the context in which the parties framed the issues. Our examination of the record in this case confirms the judgment of the district court that there is not presented by either MacGuire or McMurry evidence, under the standard of convincing clarity, that the appellees knew the information they published was false or that they published the information while entertaining serious doubts as to the truth of the published information, that is with subjective awareness of its probable falsity. We have no quarrel with the statement of the district court that, "there is a series of truths underlying the statements; many of the alleged defamations fall within the categories of honest intention, fair comment, reasonable belief, honest mistake (if in fact upon trial it should be demonstrated there were error), reliance on ostensibly reliable person's accounts, rhetorical hyperbole, etc." As the parties have framed the issues, however, no other issues are material if there is not evidence in the record which would tend to establish actual malice with convincing clarity.

Pursuing the case under the doctrines of *New York Times Co. v. Sullivan*, supra, encompasses an assumption that defamatory material was published and that it was false. The appellants then wish to

rely upon an inference of knowledge of falsity or publication with awareness of probable falsity. We hold that the standard of convincing clarity requires the plaintiffs to structure the issue of material fact by conflicting evidence. They may not rely simply on conflicting inference. We agree with the comment of the Supreme Court of Idaho that:

"Although it is conceivable that the character and content of a publication could be so patently defamatory that a jury could infer a knowing state of mind on this basis alone, no case has so held." *Bandelin v. Pietsch*, supra, 563 P.2d 400.

Our examination of the record in this case does not persuade us that a jury could infer actual malice from the content of these publications. The position of MacGuire and McMurry as we understand it is that the publications were defamatory and false as they choose to construe them. We note in passing that neither the district court nor this court nor the jury would be bound by the construction they seek to attach. They then argue very earnestly that as so construed the statements are so patently defamatory that application of the favorable-inference concept prevents the entry of the summary judgment for the publishers. We need not hold that such an inference never would be permissible because in this case as the record stands such an inference could not be drawn under a standard of convincing clarity. We have no doubt that the publishers intended that this debate should be "uninhibited, robust and wide open" and that they did encompass "vehement, caustic and unpleasantly sharp attacks" in their editorials. The rules that we are applying, however, are designed to support "a profound national commitment to the principle that debate on public issues" may be so conducted, *New York Times Co. v. Sullivan*, supra, at 376 U.S. 270, 84 S.Ct. at 721.

■ With respect to the standard of convincing clarity, it may be helpful to recognize in this case that that standard is a stringent one. It is greater than a mere preponderance of the evidence. It requires proof that is clear, precise and indubitable or unmistakable and free from serious and substantial doubt. It is that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable. *Manuel v. Fort Collins Newspapers, Inc.*, supra, 599 P.2d at 933. These definitions do not, in our judgment, substantially differ from a definition of clear and convincing evidence adopted by this court with approval from the Supreme Court of Iowa. In a case in which there was a requirement that a mistake be proved by evidence that was clear and convincing, this court, in *Continental Sheep Co. v. Woodhouse*, 71 Wyo. 194, 202, 256 P.2d 97 (1953), adopted the following language from *Good Milking Mach. Co. v. Galloway*, 168 Iowa 550, 150 N.W. 710, 712:

" * * * When the evidence is such that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a fact in dispute, then the evidence is, of necessity, clear and satisfactory."

Applying that proposition to this record discloses that what was offered by MacGuire and McMurry as evidence of actual malice is far short of the style of evidence from which any mind could readily reach a satisfactory conclusion as to the existence of actual malice.

■ We recognize that in *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), in the ninth footnote, the Supreme Court mentioned that proof of "actual malice" calls into question the defendant's state of mind and that question does not readily lend itself to summary disposition. The use of the motion for summary judgment, however, is not foreclosed, and a plaintiff to avoid the summary judgment still must demonstrate for the district court evidence upon which could be premised a finding under the standard of convincing clarity that the publisher knew the information was false or published the information with a subjective awareness of probable falsity. We have examined the evidentiary material in the record before us, and like the trial court, we find the record

to be devoid of evidence of knowledge by these appellees of the falsity of the information published even giving to that material the interpretation urged by the appellants. Indeed we do not find the appellants seriously arguing actual knowledge of falsity. Similarly even relying upon favorable inference we have been unable to discern in this record evidentiary material which could lead to a finding with the requisite convincing clarity that the appellees were aware of the probable falsity of any information which was published.

■ The only instance in this record which suggests awareness of probable falsity on the part of the publishers is set forth in the affidavit of the Manager of Natrona County International Airport during the time the editorials were published. In his affidavit he states as follows:

"9. I was personally present when Mr. MacGuire purportedly responded to a reporter's question about his responsibilities to the public by saying 'Screw 'em', and I know that Mr. MacGuire was responding to Mr. Wilkings' suggestion that Mr. McAuley and Mr. Partridge wished to ask him some questions. Mr. MacGuire's comment was in response to Mr. Wilkings' suggestion and was directed at Mr. McAuley and Mr. Partridge, not to the public, or his accountability to the public, or his responsibilities to the Board. I discussed these facts with Don Britton and Pete Williams immediately after the article appeared in the Casper Star Tribune, alleging that Mr. MacGuire had responded to a reporter's question about his responsibilities to the public, and at least Mr. Britton listened to the tape recording of that portion of the meeting and agreed that there was no question but that Mr. MacGuire had directed his comment to Mr. McAuley and Mr. Partridge in response to Mr. Wilkings' suggestion. Pete Williams was then News Director at KTWO and Don Britton was a KTWO reporter assigned to cover the Airport Board."

Mr. George's affidavit does not reflect the communication of the information by either Mr. Williams or Mr. Britton to the parties who actually published the editorials. Neither is there other evidence that this information was communicated to them. While the testimony of the publishers is not to be regarded as controlling with respect to their knowledge or state of mind, neither can that testimony be ignored when it is not refuted. Where, as here, the plaintiffs have not succeeded in producing direct or circumstantial evidence which would conflict with the testimony of the publishers, they have failed to meet their obligation of showing an issue of material fact. That failure in this case is dispositive.

The plaintiffs having failed to meet their burden at the summary judgment stage of demonstrating evidence of actual malice, the record encompasses no genuine issue of material fact, and the judgment of the district court must be affirmed.

ROONEY, Justice, specially concurring.

I cannot agree with the reasoning of the majority opinion in this matter, but I do concur in the result.

Although I come out at the same place as does the majority opinion, I feel that the reasoning of the majority opinion sets a precedent which can open the door for its application in other situations in which the logical result would be unfortunate law.

I part company with the majority opinion in its determination that Rule 56, W.R.C.P. does not mean what it says when applied to defamation cases. If there can be such exception, why limit it to defamation cases? The language of the majority opinion carefully skirts full confrontation with its holding. Regardless of the careful language, the thrust of the opinion is to have the court weigh the evidence at the summary judgment stage to determine if the standard of "convincing clarity" has been met. This is contrary to the right of a party to have a determination of factual issues be made on evidence which is presented with all of the evidentiary safeguards and re-

strictions[1] incident to a judicial trial. Such weighing of the evidence at the summary judgment stage as authorized by the majority opinion is patently contrary to the provisions of Rule 56(c), W.R.C.P. relating to summary judgments which provide in part:

"(c) * * * The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. * * *"

If there is a "genuine issue as to any material fact," a trial should be had to resolve it. The plaintiff ought not be required to prove his case at the summary judgment stage. He need only establish that there is an issue of a material fact.

By weighing the facts to determine if the element of "actual malice" is sustained with "convincing clarity," the majority opinion, in effect, rejects—or at least holds to be of no consequence—the following oft-repeated and regularly-applied position of this court:

"In reviewing an appeal from the granting of a summary judgment and in determining the existence of a genuine issue of material facts, the court must inquire from the viewpoint most favorable to the party opposing the motion, *Timmons v. Reed*, Wyo., 569 P.2d 112 (1977). Facts asserted by such party and supported by affidavits or other evidentiary material must be taken as true, *Trautwein v. Leavey*, Wyo., 472 P.2d 776 (1970), and be given every favorable inference, which may be reasonably and fairly drawn from them, *Bluejacket v. Carney*, Wyo., 550 P.2d 494 (1976)." *Reynolds v. Tice*, Wyo., 595 P.2d 1318, 1319–1320 (1979).

The majority opinion accepts the position that there exists here an issue of fact as to the presence of "actual malice." It then purports to weigh the evidence on that issue to determine if it is sufficiently established with "convincing clarity." I cannot agree with this majority opinion treatment of the plain language of Rule 56(c), W.R.C.P. and with the resulting reversal of established precedent in applying such rule.

Turning, then, to that which I believe to be the correct disposition of this matter, I would hold that the summary judgment was proper inasmuch as a careful review of the record does not reflect the existence of any genuine issue as to the controlling material fact.[2] Defendants do not contest plaintiffs' status as public figures. The query is whether or not there existed the element of "actual malice"[3] on the part of defendants. This is a controlling fact in this case inasmuch as plaintiffs' action must fail if "actual malice" does not exist as a fact. It is an essential element of plaintiffs' claim for relief.

Before considering the record as it pertains to this factor, reference is made to the following extensive quotation from *Widener v. Pacific Gas & Electric Company*, 75 Cal.App.3d 415, 142 Cal.Rptr. 304, 313–315 (1977), which orients "actual malice" in the context of a defamation action:

"Appellant contends that the trial court erred in granting respondents' motion for a judgment notwithstanding the verdict, on the ground that appellant had failed to produce sufficient evidence that the defamatory statements were made with 'actual malice,' as required by *New York Times Co. v. Sullivan*, supra, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. In *New York Times*, the United States Supreme

---

1. As distinguished from affidavit allegations, discovery purpose depositions, etc.

2. There is a fundamental difference between a determination, as I here make, that there is no genuine issue as to a material fact, and a determination, as made by the majority of the court, that such issue exists but that the evidence on one side is not sufficient for "convincing clarity."

3. Part of the difficulty in analyzing cases of this nature arises from use of the term "actual malice." As defined, it is knowledge that the published statement was false or that it was published with reckless disregard of whether or not it was false. *New York Times Company v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Under this definition, the mental element is properly "scienter" rather than "malice."

Court held that, in order for a public official to be able to recover for defamation, the First Amendment required the public official to prove, with convincing clarity, the defendant's 'actual malice,' at the time of the publication. 'Actual malice' can be shown by proving either that the defendant knew of the falsity of the statement or that the defendant uttered the statement in reckless disregard for the truth. * * *

\* \* \* \* \* \*

"Actual malice must be proved with convincing clarity. (*New York Times Co. v. Sullivan*, supra, 376 U.S. 254, 285–286, 84 S.Ct. 710 [728–729], 11 L.Ed.2d 686; *Goldwater v. Ginzburg* (2d Cir. 1969) 414 F.2d 324, 341, cert. den. 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695; see also *Field Research Corp. v. Patrick* (1973) 30 Cal. App.3d 603, 608, 106 Cal.Rptr. 473, cert. den. 414 U.S. 922, 94 S.Ct. 218, 38 L.Ed.2d 157.) *Whether there was 'actual malice,' as required by the New York Times standard, is, of course, a question of fact for the jury.* (See *St. Amant v. Thompson* (1968) 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262; *Time, Inc. v. Hill* (1967) 385 U.S. 374, 394, 87 S.Ct. 534 [545], 17 L.Ed.2d 456.) This court has a duty to closely examine the record to determine whether it could constitutionally support a judgment in favor of the plaintiff (see *New York Times Co. v. Sullivan*, supra, 376 U.S. 254, 285, 84 S.Ct. 710 [728], 11 L.Ed.2d 686), but this does not involve a de novo review of the trial court proceedings wherein the jury's verdict is entitled to no weight. (See *Alioto v. Cowles Communications, Inc.* (9th Cir. 1975) 519 F.2d 777, 780, cert. den. 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259; *Guam Federation of Teachers, Loc. 1581, A. F. T. v. Ysrael* (9th Cir. 1974) 492 F.2d 438, 441, cert. den. 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111; *Fopay v. Noveroske*, supra, 31 Ill. App.3d 182, 334 N.E.2d 79, 87.)

" * * * Reckless disregard 'cannot be fully encompassed in one infallible definition'; rather, 'its outer limits [must] be marked out through case-by-case adjudi-

cation, . . .' (*St. Amant v. Thompson*, supra, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262.) It is clear, however, that *it involves a stringent and subjective standard.* It is not measured by whether a reasonably prudent person would have published, or would have investigated before publishing. Rather, there must be sufficient evidence to permit an inference that the defendant must have, in fact, *subjectively* entertained serious doubts as to the truth of his statement. (*St. Amant v. Thompson*, supra, 390 U.S. at p. 731, 88 S.Ct. 1323 [at p. 1325]; *Alioto v. Cowles Communications, Inc.*, supra, 519 F.2d 777, 779; *Montandon v. Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938, 947, 120 Cal.Rptr. 186, cert. den. 423 U.S. 893, 96 S.Ct. 193, 46 L.Ed.2d 126.) *Actual malice, under New York Times, concentrates on the defendant's attitude toward the truth or falsity of the material published, and does not focus on the defendant's attitude toward the plaintiff.* (*Cantrell v. Forest City Publishing Co.* (1974) 419 U.S. 245, 251–252, 95 S.Ct. 465 [469–470], 42 L.Ed.2d 419; *Carson v. Allied News Co.*, supra [7 Cir.], 529 F.2d 206, 214.) Where the defamatory statements made by the defendant do not involve an element of 'hot news' and the need for expeditious release is not present, reckless disregard for the truth may be evidenced in part by failure to investigate thoroughly and verify the facts. This is particularly true where the substance of the defamatory statements, which the defendant was publishing, were such that substantial danger to reputation was apparent. (*Curtis Publishing Co. v. Butts,* supra, 388 U.S. 130, 87 S.Ct. 1925 (sic) [1975], 18 L.Ed.2d 1094; *Goldwater v. Ginzburg*, supra, 414 F.2d 324, 339; *Carson v. Allied News Co.*, supra, 529 F.2d 206, 211; *Fopay v. Noveroske*, supra, 334 N.E.2d 79, 88.) '[W]hen the story is not "hot news," . . . the investigation must be more thorough, and "actual malice may be inferred when the investigation . . . was grossly inadequate in the circumstances."' (*Vandenburg v. Newsweek, Inc.* (5th Cir.

1975) 507 F.2d 1024, 1026.) '[E]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, *by cumulation* and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. (See, e. g., *Curtis Publishing Co. v. Butts*, supra.' *Goldwater v. Ginzburg*, supra, 414 F.2d 324, 342; emphasis added.) In *Curtis Publishing Co.*, the Supreme Court found that a muckraking intent, the absence of any 'hot news' element, and an inadequate investigation, were all significant factors in determining actual malice. "The mere profession of a defendant that he believed in good faith that his statements were true does not automatically entitle him to a verdict in his favor. (*St. Amant v. Thompson*, supra, 390 U.S. at pp. 732–733, 88 S.Ct. 1323 [at p. 1326].) '*As in all cases, civil or criminal, turning upon the state of an individual's mind, direct evidence may be rare* ; usually the trier of facts is required to draw inferences of the state of mind at issue from surrounding acts, utterances, writings, or other indicia.' (*Herbert v. Lando* (S.D.N.Y.1977) 73 F.R.D. 387, 395.) As the court stated in *Goldwater v. Ginzburg*, supra, 414 F.2d 324, at p. 343: 'Recklessness is, after all, only negligence raised to a higher power. *To hold otherwise would require that plaintiff prove the ultimate fact of recklessness without being able to adduce proof of the underlying facts from which a jury could infer recklessness.* It would limit successful suits to those cases in which there is direct proof by a party's admission of the ultimate fact, certainly a situation not intended by the Supreme Court. See *St. Amant v. Thompson*, supra, 390 U.S. at 732–733, 88 S.Ct. 1323 [at 1326].' " (Emphasis supplied.)

Although the record in this case is viewed from the standpoint most favorable to plaintiff, and although his position is given every favorable inference, and although all of the required caution is applied, the record does not reflect the existence of a genuine issue on the *underlying* material facts relative to the controlling factor of "actual malice." Completely lacking is an indicia of evidence reflecting "knowledge" or "reckless disregard" on the part of defendants. Of course, the mere assertion that defendants had such "knowledge" or "reckless disregard" will not suffice. Categorical assertions of ultimate facts, without supporting evidence, is not sufficient to defeat a summary judgment. *Maxted v. Pacific Car & Foundry Co.*, Wyo., 527 P.2d 832 (1974); *Cantonwine v. Fehling*, Wyo., 582 P.2d 592 (1978); *Keller v. Anderson*, Wyo., 554 P.2d 1253 (1976).

The definitions of terms having distinct legal meanings and the determination of the standards under which such terms are applied to the facts in a given case are questions of law for the court. The determinations as to whether or not such standards are met and whether or not the facts of a given case fall within such definitions are questions of fact for the jury or other fact finder. *Miller v. Reiman-Wuerth Company*, Wyo., 598 P.2d 20, 23 (1979).

In this case, "knowledge of falsity" and "reckless disregard" are terms with distinct legal meanings in relation to the context in which they are used. 23 Words and Phrases 446, et seq. and 36 Words and Phrases 799, et seq. The definition of "reckless disregard" in the context of a libel action is set forth in the quoted portion of *Widener v. Pacific Gas & Electric Company*, supra. A definition of "knowledge of falsity" in the context of a libel action is set forth in *Hutchinson v. Proxmire*, D.C.W.D.Wis., 431 F.Supp. 1311, 1328 (1977):

> " 'Knowledge of falsity' presumably means just what it says: *subjective awareness* by the defendant that his statements were false. * * *" (Emphasis supplied.)

Keeping in mind that the evidence of "knowledge of falsity" and of "reckless disregard" must be subjective as it relates to defendants, i. e., not objective such as it might relate to that which a "reasonable" or "average" person would know or disregard; and keeping in mind that we are not concerned with the actual truth or falsity of

the statements in this respect or with the animosity or prejudice of defendants toward plaintiffs, if any, or with the way in which defamation, if any, is accomplished, *Kapiloff v. Dunn*, 27 Md.App. 514, 343 A.2d 251 (1975), a search of the record does not reveal the potential for any evidence relative to "knowledge of falsity" or "reckless disregard." There is no reference to the existence of evidence on this issue. There is no indication of an improper motive for publishing the material alleged to be false. The recitation of the statements here alleged to be defamatory may be interpreted to show animosity, but such is not a material issue. The recitation of such statements does not in itself establish the falsity of them, let alone the "knowledge" of such falsity, or a "reckless disregard" with reference thereto.

In summary, the record does not show a potential for evidence reflecting that defendants had "knowledge of the falsity" or a "reckless disregard" of the truth of the statements alleged to be false. These material items, therefore, were not genuinely placed in issue and a summary judgment was proper as a matter of law.

## APPENDIX A

### TRANSCRIPT OF EDITORIAL—K–2
July 13, 1976

As the result of inquiries which began in February into certain business dealings of the Natrona County Airport Board, K–2 has learned that the large twelve thousand square foot hangar # 1 at the county airport is being leased to a private corporation called Natrona Service, Inc. Records of the Wyoming Secretary of State reveal that the Company is controlled by the very same person who is a member of the Airport Board and up until yesterday served as President—John MacGuire. Rentals charged to that corporation are far below what would be asked for comparable space elsewhere in the community. The hangar is being used primarily for a mineral claim staking business rather than as a public aircraft flying service, the intended purpose of the building, and the latest lease acknowledges this.

Even after it became known to the Airport Board and the Natrona County Commissioners that K–2 was investigating an apparent conflict of interest, a new ten-year lease was granted MacGuire's personal corporation, though his previous lease would not have expired until January 31, 1977. Despite the fact that the Airport Board is desperate for income, the new lease does not increase the rental charges over the previous term. Mysteriously, for rent computing purposes, Mr. MacGuire's hangar shrunk from 12,570 to 9,760 square feet from one lease to the next.

Further, we found that the Airport Board failed to advertise the space to other prospective renters, and that such space was available at the bargain basement rate of 3 cents per square foot per month. The rental for the massive hangar # 1 is only $292.80 per month. Many apartment dwellers in Casper pay more than that.

Member MacGuire in a June meeting of the Board participated in and actually led a discussion which could result in the expenditure of $179 M in taxpayer funds for the improvement of his and other airport hangars, even though his lease says that such improvements are his private responsibility. If the Airport Board were to spend $179 M on the five hangars proportionately, the cost of the work of the (MacGuire hangar would be $36,000. Under those circumstances, the $3,500 per year rental fee) MacGuire pays would barely cover the interest, and would not pay off the investment. Therefore, if the taxpayers were to invest further into the board member's private business through the improvement of his leased hangar, it would be the same as giving him free rent at the taxpayer's expense.

An examination of the lease also reveals that Mr. MacGuire is not required to pay the Airport Board the same additional rental of 4 cents per gallon for aviation fuel as do the lessees of the other four hangars. Other lessees pay 4 cents on all gallonage sold to others or used by themselves.

MacGuire signed other hangar leases as President of the Airport Board but signed his own lease as President of Natrona Service, Inc. In the case of MacGuire's personal lease then Board Vice-President Jan Wilking signed representing the Airport Board.

K–2 also has learned that the Airport Board in the past has permitted the use of county employees labor for the repair of buildings under lease at no charge to the lessees, and that the CPA firm which examined the airport books last year said that the Board's bookkeeping was at variance with generally accepted accounting principles.

Although Mr. MacGuire and his buddies on the County Airport Board made it so difficult to gain access to the public records in their possession, that our attorneys had to threaten suit under the Wyoming Open Records Law, K–2 has enough information now to conclude that the operation of the Airport Board is shabby and disgraceful and must be cleaned up. If what Mr. MacGuire and others are doing at the airport in mixing their personal business with that of the public is not against the law, it ought to be. County Attorney Burke's investigation certainly is justified. The airport does not belong to the County Commissioners nor does it belong to their appointees on the Airport Board. It belongs to the taxpayers of Natrona County, who received the former Air Force base as a gift from Uncle Sam in 1952.

At least two of the three County Commissioners have been aware of aspects of MacGuire's dealings for several months yet they still reappointed him to a new 5 year term, starting July 1. K–2 believes that the County Commissioners, by reappointing Mr. MacGuire, in any capacity have contributed to a situation which is nothing short of self-dealing and conflict of interest.

Coupled with the news of the illegal award of haying contracts and the grant of special water privileges to members of "The Airport Club", the message should be loud and clear, that those who serve on the Airport Board and those who appointed them should be told that government is not a vehicle for the support of a select few at the expense of the many.

The people of Natrona County are entitled to county boards that are operated in an open and clean manner. They should not be packed with buddies and business associates of the County Commissioners.

K–2 believes that by any moral, legal or ethical standard, no person holding public office by election or appointment has the right to mix his personal pocketbook with that of the public.

## APPENDIX B

### TRANSCRIPT OF EDITORIAL—K–2

July 28, 1976

On July 13, KTWO charged in an editorial, that a member of the County Airport Board, John MacGuire, was mixing his personal business with that of the public by leasing a 12,000 square foot hangar from his own board at rates far below the local market. The editorial exposed the fact that Mr. MacGuire was enjoying the use of the nearly three thousand square feet of space for his business at absolutely no charge. The lease was granted without advertising the availability of the building to other potential renters. A number of other serious deficiencies were pointed out, and K–2 is prepared to document all of its contentions.

Every member of the Airport Board and each of the County Commissioners was mailed a copy of the editorial along with written notice of the availability of free time to respond to the editorial. K–2 took other steps to encourage a reply, but after two full weeks, there has been no such request from those in positions of authority. Perhaps the Commissioners and the Airport Board members have been too busy issuing votes of confidence in each other to tell the public how county business is being conducted.

As the result of further investigation, K–2 now is prepared to state that the new ten year lease the Airport Board granted in

April to its then President MacGuire would seem to be depriving the taxpayers of Natrona County of at lease $12 thousand dollars a year in potential income, or a total of $120 thousand dollars if conditions remain unchanged.

The lease is written at the rate of 3 cents per square foot per month, and MacGuire uses the building for offices and operation of his mineral claim staking business. Elsewhere in the Casper area, the going rate even for dead storage space is more in the area of 20 cents per square foot. That is more then 600 percent higher than MacGuire is paying on his sweetheart deal. The Airport Board will never know precisely how much it is giving away until it voids the defective lease and offers the space on a competitive basis.

The problem here goes well beyond that of a county board member engineering himself a good deal at the public's expense. The ethics and morality of such transactions quickly become known to others who say, "If somebody can do it, why can't I?" It spreads like a cancer throughout government if allowed to go unchecked and unchallenged. The press has a public responsibility to see that it doesn't, since one politician generally will not police another.

K–2 believes that by issuing a blanket endorsement of MacGuire's actions, the County Commissioners have set an ethical standard that is too low for the people of Natrona County to accept.

## APPENDIX C

TRANSCRIPT OF EDITORIAL—K–2
August 16, 1976

The Natrona County Airport Board will have an opportunity Tuesday to restore some of the public's lost faith in the quality of its county government. The Board is meeting primarily to act upon airport leases which were issued illegally behind closed doors. With its own attorney and a full-time paid manager and staff, K–2 is surprised at how far the Board has strayed from the path of propriety.

The big bone of contention is the conflict of interest involving the hangar lease of Airport Board member John MacGuire, the lease having been awarded while MacGuire served as President of the Board, without giving others the opportunity to bid on the space. A previous K–2 editorial pointed out that MacGuire's "sweetheart deal" would cost the taxpayers of Natrona County at least one hundred thousand dollars in lost potential income based upon the going rate for such space in Casper.

The Airport Board has tried to save face for its 3 cents per square foot giveaway to MacGuire by saying the price is in line with what some other airports in the region are charging. K–2 is not particularly concerned about what is being charged in Grand Junction or in Timbuctu. We are interested that the taxpayers of Natrona County receive fair rental income based upon the going rates in Casper, Wyoming in the year 1976. Anything less than that is a breach of public trust on the part of the Airport Board. If there is any question in their minds, let them go out and try to lease space and find out on an open competitive basis what the Casper rental market is like.

Then there's the matter of MacGuire's space being 12,570 square feet rather than 9,760 square feet for rent computing purposes. When K–2 revealed that the Airport Board President was not being charged for nearly 3,000 square feet each month, MacGuire wrote a check to repay the county for three months arrears. However, K–2 has learned that MacGuire's payment was a mere token since he has been receiving the benefit of the free space not just for three months, but actually for a number of years. As of last week, the bulk of his rent underpayment had not been collected by the Airport Board.

Many Natrona County residents have complimented K–2 for the investigative reporting which unearthed the Airport lease irregularities. Actually, it was a lot simpler than it appeared. All we had to do was read paragraph 4 of the old lease and paragraph 4 of the new lease and there it was! It makes us wonder how Airport

Manager George and his boss, Mr. MacGuire didn't catch it, too. MacGuire signed it and George must have presented it. If K–2 had not reported it, it would have cost the taxpayers another ten thousand dollars over the term of the lease.

This leads us back to the matter of mixing one's personal business with that of the public and the conflict of interest that results. As for the miscalculated rent, one can see how terribly, awfully awkward it must be for Airport Manager George to put the arm on the man who signs his paycheck. When serving two masters, it's usually the public master which gets the short end of the stick.

There is on file in the office of the Natrona County Clerk on page 84, Book 141, a Transfer Deed dated May 12, 1952. This document conveys from the United States of America to the people of Natrona County, Wyoming, 29 tracts of land totalling some 2,000 acres, nearly 120 buildings and supporting equipment which had been an Air Force base. The pricetag from Uncle Sam to the people of Natrona County for the multi-million dollar facility was exactly zero. Not a dime.

K–2 is determined to see that the property is operated in the best interests of the general public, not just for a special few. We hope there are enough men of conscience serving on the Airport Board Tuesday to outvote those whose shameful disregard of ethical conduct has evoked the public's indignation. Airport leases must be granted openly and cleanly with an equal opportunity for all.

## APPENDIX D

### TRANSCRIPT OF EDITORIAL—K–2

August 27, 1976

Any remaining doubt as to whether the public was being ripped-off as the result of hangar rental irregularities by the Natrona County Airport Board should have been settled by last week's meeting. It is ironic that at the same time the board was ratifying a 10 year lease under which Airport Board member John MacGuire will receive more than $100 thousand dollars in taxpayer subsidy for his private business, the members had the gall to make it known that they may ask the County Commissioners to cut the airport in for a share of the next 1% sales tax package. Won't it be swell to have that to ponder while standing in line at the supermarket check-out counter. It means some of the extra 1% tax you pay on groceries may be going directly into the Airport Board member's personal pocket.

A reporter asked Mr. MacGuire a question regarding his accountability to the public. The response of this public servant was "screw 'em". Well indeed he has, and the answer merely confirmed an attitude that hardly is in keeping with open and clean government. Sadly, the County Commissioners and their cronies have chosen to "circle the wagons" and "stonewall it" in the face of a loss of public confidence in the quality of county government.

By refusing to collect the years of back rent owed the county by Mr. MacGuire and refusing to charge prevailing rates for space in the fact of conflict of interest questions, the Airport Board is burning the public's money in the streets. If they insisted upon a fair price for Mr. MacGuire's building rental, it might not be necessary to ask the taxpayers to pony up that amount.

Airport Board members are appointed by the County Commissioners and therefore cannot be voted out of office. But the people who appointed them and condone their actions certainly can be booted out on election day.

By stubbornly defending Mr. MacGuire's abuse of an appointed position for his own personal gain, the County Commissioners are saying to the public, "If you don't like it, do something about it! "

Two of the three County Commissioners will be appearing on the General Election Ballot this year. County Commissioner Chairman John Burke, Mr. MacGuire's staunchest ally, is seeking another four year term. Commissioner Vern Rissler, without giving up his present commissioner's posi-

tion, has decided to make his talents available to the State Senate. Both of these candidacies can serve as a referendum as to whether the people of Natrona County want public officials to intermingle their personal pocketbooks with the public cash drawer.

K–2 has presented hard, cold evidence to prove that this is exactly what has happened. Not a single fact that we have presented to the public has been refuted. Repeatedly, we have offered freetime to those involved, but to no avail.

The situation must be cleaned up and it's up to the people.

## APPENDIX E

### TRANSCRIPT OF EDITORIAL—K–2

September 15, 1976

K–2 feels obligated to respond to County Commission Chairman John Burke's statement on news media criticism. We have purposely delayed this response a few days so that it would not come on the eve of the Primary Election.

There was a practice among the ancient tribes that when a messenger was the bearer of bad news, he was summarily executed. Surely, Commissioner Burke was not suggesting that we revert to that practice when he charged the news media with "half-truths, mud-slining and innuendoes." His statement simply is not true.

It is hardly an innuendo when K–2 states flatly, in a simple declarative sentence, that there has been self-dealing practiced by a member of the Airport Board. It is hardly mud-slinging and half-truth when we have provided names, dates, dollar amounts and the provisions of lease documents. It's all a matter of public record.

So, Mr. Burke's wrath should more appropriately be vented upon those who have used their public position for personal gain rather than against the messenger who has the responsibility to bring him the bad news.

The Commissioners were told of the situation at the airport fully seven months ago.

Forming a powerless committee to look into the matter at this date is like locking the barn door after a very large horse has escaped.

Mr. Burke's statement raises another question. Should the County Commissioners speak out only when criminal acts are committed? As the highest elected officials in the county, shouldn't they speak out when unethical practices are exposed? If Mr. Burke is as concerned about "the entire fabric of local government" as he says, he should set a high moral and ethical standard for County Government by speaking out against those who are making a bad name for the many public spirited citizens who give freely and unselfishly of their time, serving on city and county boards in the best interests of the community.

County Commission Chairman John Burke's statement reads as follows:

September 8, 1976

To: The Citizens of Natrona County

From: John P. Burke

For many weeks the Casper Star-Tribune and KTWO have almost daily criticized certain County Boards, and Commissioner Rissler and myself. Up to now, I have elected to ignore these criticisms because a certain amount of it should be expected by any elected official. Recently, however, these two self-appointed guardians of the conscience of Natrona County have seen fit to publicly indict my family name and my Irish ancestry.

Whether or not I am elected a County Commissioner is not of this moment important—win or lose—I will still be John Patrick Burke and I will still be an American of Irish ancestry. Important to me however, as I am sure it is to every citizen of this county, is my personal reputation, creditability and integrity.

During my almost forty years of adult life, I have endeavored to serve Casper, Natrona County and Wyoming in many civic ways. I have done so in the belief that each of these: Casper, Natrona County, and Wyoming have been good to an Irish immigrant family that settled here in 1901, the

first of whom was my father who started his dream of becoming an American citizen as a sheep herder on the plains and mountains of central Wyoming. He came with nothing and asked nothing, as did so many other immigrants of that time, except the opportunity to work hard as a free man. Work hard he did and with perservance and good fortune he succeeded. In succeeding, however, he instilled in his children the obligation to be active in the affairs of Casper, Natrona County and Wyoming—not for personal gain, but as some partial repayment of a debt of gratitude.

Never, in all the years that I have served this county, have I been so simple as to believe that everyone always agreed with my decisions. I have fully believed the old saying that "show me a man who has no enemies, and I'll show you a man who has done nothing." On the other hand, I have believed that I had certain obligations to the people of Natrona County, in whatever position I held and in whatever decision was before me. The obligation was to perform my duty as I believed it to be, in the best interests of the citizens of this county, without regard for my own personal interest and without advantage to me or my family. This I have done.

As County Commissioners, Vern Rissler and I have been criticized for appointing "cronies" to certain administrative boards of the county. Cronies means "intimate friends". Fortunately for this county many of our friends have accepted appointments to various boards. We are proud of our appointments, for we have been able to prevail on some of the most responsible and successful men and women in this county to serve, not for pay, but for personal gratification in helping to make this county a better place in which to live and work. Sure—we don't agree with every decision each of these boards has made during our terms of office but we do respect the integrity of these boards and of their members. Every thinking person must realize that were we to discharge every board each time the commissioners disagreed with their decisions we would soon have no boards because no responsible citizen would be will-

ing to serve on them. These boards are not "rubber stamps" for the County Commissioners, and let's hope they never are.

Let's look at the accomplishments that have accrued to the people of this county over the years—mostly due to the dedicated service of responsible citizens serving gratuitously on these boards. We have today—

A—One of the finest public supported hospitals in the Rocky Mountains. This has enabled Casper to attract some of the finest specialized medical talent available in our nation to practice here.

B—One of the finest municipal airports to be found for a community our size—anywhere in the nation. Jack Rosenthal, General Manager of KTWO is regarded as one of the more extensive air travelers living in our county. He knows that overall our airport facilities are something to be proud of—for he—far more often than most of our citizenry has had the opportunity to compare them first hand.

C—One of the largest and best attended County Fairs in the Rocky Mountains is our own Natrona County Fair and Rodeo. This is not by accident, but rather the result of years of trial and errors, sweat and anguish, on the part of many in our county who have served unselfishly on the Fair Board.

I could go on about each of our boards, but the conclusion is the same, namely, that we have much to be proud of in this county that is the direct result of dedication and hard work on the part of our boards.

Now—what is at stake for Natrona County? At stake is that should unfounded and unreasoned personal attack continue the entire fabric of local government will suffer. The citizens of the county will be deprived, because in the course of time with repeated innuendos by KTWO and the Casper Star-Tribune the people will lose faith in their government—not because of lack of performance, but because of baseless criticism. Our responsibility as County Commissioners is to assure good management for and to the affairs of this county. We believe the record shows that good management has in fact been supplied. We believe that investi-

gation, initiated at our request, by the elected County Attorney has not resulted in any basis for filing civil or criminal charges against any of our board members or county employees.

It appears that our attackers are resorting to the rule that continually stated, unfounded allegations become "facts." This is accomplished only if the readers and listeners are gullible enough to be unable to distinguish fact from fiction.

I submit that if the Casper Star-Tribune and KTWO have evidence of graft, corruption or criminal activity on the part of any elected official, any member of any county board, or any county employee, they owe an obligation to the citizens of the county to submit the documented, concrete evidence to the County Commissioners and the law enforcement agencies. This is the proper way to handle their responsibility—rather than the nebulous method of guilt published and editorialized by both the Casper Star-Tribune and KTWO in press innuendos designed to make conclusions in and for the public, without due process of law.

In conclusion I state, without reservation, that the affairs of Natrona County are in an excellent status, free of corruption, and that the real disservice to the people of Natrona County is not in the performance of the County Commissioners, their appointed boards and county employees, but rather in the half truths, mud slinging and innuendos of KTWO and the Casper Star-Tribune.

/s/ John P. Burke
John P. Burke

## APPENDIX F

### TRANSCRIPT OF EDITORIAL—K–2

December 9, 1976

The report of the Grand Jury investigation of the Natrona County Airport contains much interesting matter for those who read the entire text with care. For example, it says:

1. That contracts and leases had been acted upon illegally in executive session, closed to the scrutiny of the public and the press. There are at least four separate references to such acts in the Grand Jury report.

2. That public supplies and equipment have been improperly used for private purposes.

3. That the good business practice of public bidding on major transactions has not generally been observed.

4. That county employees on county time have been used to perform maintenance on a private water line at no charge to the owner, a former Airport Board member.

5. That at least one board member was not maintaining sufficient "arms length" in his personal transactions with the board.

6. That a hangar was occupied by an Airport Board member under a "verbal sublease", a poor business practice.

7. That this Airport Board member had been underpaying the county to the extent of 2,810 square feet of leased space.

These Grand Jury findings must sound very familiar to many people since they are, point by point, what K–2 has been saying editorially since July. These findings are also somewhat in contradiction with the general laudatory conclusions of the report.

The blanket criticism of the news media seems to be unwarranted on the basis that the report confirms what the press has been charging. To chastise the media for telling the truth should not take place in a free society under the First Amendment. If the Grand Jury wishes to raise the cry of "half truth and innuendo" let them specify exactly what they feel falls into that category. The day should never come when the press should be immune from criticism. This, too, is healthy in a free society.

There need be no despair about the cost of the airport investigation. The monies that will be recovered from airport lease underpayments by one Airport Board member and other recoveries underwrite a major part of the cost. This underpayment was not uncovered by the public officials charged with that responsibility, but rather it was first revealed in a KTWO Editorial.

We respectfully take exception to one other major area in the report and that is the jury's finding that "the rental rates are competitive taking into consideration the location and types of structures and facilities".

K–2 believes that a through study would reveal that the going rate for warehouse space in the area is 20 to 25 cents per square foot per month rather than the 3 cents being paid by one Airport Board member.

It should be very apparent as a result of the Grand Jury investigation that public boards in Wyoming need stronger and clearer guidelines for the conduct of the public's business than they have presently.

We are pleased that the Airport Board already has taken action to correct many of the deficiencies that we have pointed out. The public will benefit from the charges and investigation by a more open and businesslike operation of this board and others.