**Neil McMURRY, Appellant (Plaintiff below),**

v.

**HOWARD PUBLICATIONS, INC., a Delaware Corporation, dba Casper Star-Tribune, Thomas W. Howard, Phil McAuley and Dan Partridge, Appellees (Defendants below).**

**No. 5050.**

Supreme Court of Wyoming.

June 2, 1980.

Daniel M. Burke of Burke & Horn, Casper, for appellant.

Hugh M. Duncan, Casper, for appellees.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROONEY, JJ., and GUTHRIE, J., Retired.*

THOMAS, Justice.

This is a companion case to *MacGuire v. Harriscope Broadcasting Co.*, Wyo., 612 P.2d 830 (1980). The cases were consolidated for argument. Like its companion case, the primary issue here is the application of the actual-malice rule of *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964), in connection with a motion for summary judgment by the publisher of allegedly defamatory material. By brief and argument the appellees presented alternative bases for sustaining the trial court's judgment. We do not consider those alternative propositions because we conclude that the rules of law set forth in *MacGuire v. Harriscope Broadcasting Co.*, supra, are applicable and dispositive. We will affirm the judgment of the district court.

The appellant, who was the plaintiff in the trial court, Neil McMurry, is the same individual who was also an appellant in *MacGuire v. Harriscope Broadcasting Co.*, supra. He served as a member of the Natrona County Airport Board from 1974

* ROSE, J., having recused himself from participation in this case, GUTHRIE, J., Retired, was assigned, having been retained in active judicial service pursuant to Article 5, Section 5, Wyo-ming Constitution, and Section 5–1–106(f), W.S.1977, by order of this court entered on January 1, 1979.

through the period of the accused publications in this case, the last of which was published on September 30, 1976. Here also there is no question that McMurry is a public official for purposes of invoking the rule of *New York Times Co. v. Sullivan,* supra, and the additional rules of law set forth in *MacGuire v. Harriscope Broadcasting Co.,* supra.

The appellees, who were defendants in the district court, include the publishing company, the editor and publisher, the managing editor and the state editor of the Casper Star-Tribune. Howard Publications, Inc., owns and operates the Casper Star-Tribune. Thomas W. Howard is the editor and publisher of the newspaper, Phil McAuley is the managing editor, and Dan Partridge is the state editor. McMurry alleges in his complaint that the Casper Star-Tribune is the largest newspaper in the State of Wyoming and the only newspaper of general circulation in the Casper area. In July of 1976 a series of news articles and some editorial commentaries were published in the Casper Star-Tribune relating to various aspects of the operation of the Natrona County International Airport. The news articles included such topics as the awarding of a contract to a former board member for harvesting hay on the airport; the sale of water by the airport to the same former board member; the utilization of off-duty airport personnel to build a home by a son of a former manager, and the granting of discounts on construction materials purchased in connection with that home because of the assumption that the materials were purchased for the airport; the lease of an airport hangar by board member John MacGuire, and an apparent conflict of interest on the part of MacGuire's attorney who also was attorney for the airport board; and the utilization of airport buildings without charge by employees of the airport.

Another series of articles related to an investigation of the activities at Natrona County International Airport by the county attorney; his conclusion that no charges would be filed as a result of that investigation; a suggestion that a further investigation would be conducted by the State Attorney General; the declination by the attorney general of any further investigation; and a decision by the chairman of the airport board to not attempt to pursue a private investigation. There was also an article on the decision to increase wages for 11 employees who also served as members of the voluntary fire department at the Natrona County Airport. Two other articles concerned the announcement by the chairman of the board of county commissioners that he would consider an independent investigation, and the resignation of the airport manager. Many of the articles discussed apparent improprieties in connection with the conduct of the business of the Natrona County International Airport.

McMurry's libel action was based upon statements contained in three editorials published on August 15, 1976, September 3, 1976, and September 30, 1976. The text of these editorials is appended as Appendix A (September 3, 1976); Appendix B (September 30, 1976); and Appendix C (August 15, 1976).

McMurry complains of specific language from the texts of these editorials in the six counts of his complaint. The accused language in these six counts reads as follows:

### COUNT I

"The Natrona County International Airport Board continues to operate on a collision course. It is rudder-less, seeking a mooring but finding none, and out of control.

"Shocking new revelation is heaped upon revelation. It is apparent to the public that nothing is being done except patchwork of the most temporary sort.

"Arrogance, surliness, coupled to the persistent insistence that the airport operation is none of the public's business and just who does the press presume to be to question our operations? are the over-riding attitudes of several members of the Airport Board.

"We thoroughly dislike blanket indictements [sic] so we make it clear that we do

not include Airport Board member Bob Heizer in this criticism.

"In the best ideals of public service, he was called upon to serve on the board and he accepted. We wonder now how often Mr. Heizer has pondered why he accepted his public trust and be subjected to the frustrations—essentially a voice alone—in attempting to provide some direction to a board hopelessly off course. He is trying to get these appointed board members he must work with to operate in a business-like manner for the benefit of the taxpayers.

"It is a difficult, if not hopeless, task."

### COUNT II

"The troubles at the airport are deep. They are being treated quickly and cosmetically with no attempt to get to the source of the troubles.

"They began years ago by being a superboard; they have been compounded under the leadership of former Board President MacGuire. He performed essentially like a one-man band—hiring, firing, making administrative and policy decisions rubber stamped by the board. He remains reluctant to relinquish what he considers his preogative [sic].

"What is to be done?

"If the County Attorney and the Wyoming Attorney General obstinately refuse to do their public duty and determine just what is wrong with the airport operations, use public funds to employ private investigators. Give them a free hand to determine what is wrong with the operations and then let them make recommendations which must be carried out."

### COUNT III

"How much ignorance of the law, coupled in arrogance are the people of Natrona County going to be subjected to from its elected officials? We're referring to [sic] latest episode in a long series of eye-opening developments involving the elected Natrona County Board of County Commissioners, the appointed Natrona Coun-

ty Airport Board, and the Natrona County Attorney's office.

. . . . .

". . . Past actions included entering into a contract for hangar space with a member of the Airport Board and past president, John MacGuire, to lease space to conduct his private business.

"Despite these past actions, and loss of public confidence, it's obvious that the County Commissioners, Airport Board, County Attorney, and the Airport Board manager plan to continue to operate its policy of the public be damned.

. . . . .

"Such actions by elected and appointed officials are repugnant since they ignor [sic] public trust, duty and responsibility."

### COUNT IV

"It remains incomprehensible to us that the Airport Board, obviously with the approval of the County Commissioners and County Attorney, continues to operate as a separate entity. It indicates that the County Commissioners and County Attorney are afraid of what a private investigation might unearth."

### COUNT V

"The combined actions of the three boards is an arrogant extension of the public be damned attitude as expressed by Airport Board member MacGuire's succinct but obscene response of 'Screw em' when he was asked by the Casper Star-Tribune about his responsibilities to the public board.

"With the tacit approval of the County Commissioners, this will obviously continue to be the attitude of the Airport Board."

### COUNT VI

"Come to the point, gentlemen. Do your duty. Don't play the public for suckers. Is there anyone being protected? Do you feel you are incompetent to conduct such an investigation? Why is the State, with

all of its resources, incapable of conducting an impartial investigation?"

As also was true in *MacGuire v. Harriscope Broadcasting Co.*, supra, McMurry limits the issue presented to this court to the sufficiency of showing actual malice under the rule of *New York Times Co. v. Sullivan*, supra. He states the issue as follows:

"Whether the evidence, taken in the light most favorable to Appellants [sic] and drawing all reasonable inferences therefrom, could establish by a preponderance of the evidence that the statements were libelous statements of and concerning the Appellants [sic] and *could establish with convincing clarity that the statements were published with actual malice.*" (Emphasis added.)

The appellees state the issue in the following language:

"Was it error for the trial court to grant a summary judgment in favor of the defendants, where the evidence offered by defendants established that there was no issue of material fact, and the plaintiff, a public official, was unable to offer evidence of a sufficient quantum to establish a prima facie case, and the offered evidence did not contain the standard of convincing clarity?"

We will not repeat in detail here the legal principles incorporated in *MacGuire v. Harriscope Broadcasting Co.*, supra. A brief summarization is sufficient. When defendants in a libel action, which is governed by the standards of *New York Times Co. v. Sullivan*, supra, submit a motion for summary judgment the trial court must analyze the evidentiary matters presented by the plaintiff under the standard of "convincing clarity" promulgated in the *New York Times* case. A genuine issue of material fact is present only when after viewing those matters in the light most favorable to the plaintiff the court is persuaded that the trier of fact could find under the standard of "convincing clarity" the presence of actual malice, i. e., knowledge of the falsity of the published information or publication with reckless disregard of whether it was

false or not. If the evidentiary matters presented at the trial court would not justify submission of the case to the trier of fact pursuant to the standard of "convincing clarity," they then must be considered insufficient to raise a genuine issue of material fact at the summary-judgment stage of the proceedings. *MacGuire v. Harriscope Broadcasting Co.*, supra.

The trial court in this instance found that the evidentiary matter in the record relied upon by McMurry was insufficient to present a genuine issue of material fact as to actual knowledge of falsity or publication with reckless disregard of whether the matter was false or not. Our analysis of the record is consistent with that of the district judge. The evidence which McMurry relies upon, as we said in *MacGuire v. Harriscope Broadcasting Co.*, supra, 612 P.2d at p. 839, is "far short of the style of evidence from which any mind could readily reach a satisfactory conclusion as to the existence of actual malice."

Here, as in *MacGuire v. Harriscope Broadcasting Co.*, supra, the closest showing of any awareness of probable falsity can be found not only in the affidavit of the manager of Natrona County International Airport but also in testimony by the president of the airport board to the effect that when John MacGuire said, "Screw 'em" he was not referring to the public but to the individual appellees McAuley and Partridge. The contention is that McAuley and Partridge both knew that to be the fact and yet in the September 3, 1976, editorial they continued to rely upon a false statement of fact in making their editorial comment. In their affidavits, however, both McAuley and Partridge stated in substance that at the time the comment was made and at the time of the execution of the affidavits they believed that the reply was made to McAuley's question about MacGuire benefiting from the taxpayers' money.

While, as we noted in *MacGuire v. Harriscope Broadcasting Co.*, supra, the testimony of the publishers is not to be controlling with respect to their knowledge or state of mind, it cannot be ignored when it

is not refuted. Here we find no evidence to demonstrate subjective awareness by the appellees that their perception of the events at the airport board meeting when that comment was made was not correct. While they might have been free to accept the version of those events claimed by McMurry they were not required to do so. A subjective awareness of probable falsity cannot be demonstrated under the standard of "convincing clarity" by evidence showing that the publisher and the plaintiff disagreed with respect to their perceptions of events which they both observed. This rule is consistent with those applications of the doctrine of *New York Times Co. v. Sullivan,* supra, which excuse the publisher from investigation even when a claim of falsity is called to the publisher's attention. *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

In this case the appellee also argues that the summary judgment granted by the trial court can be justified on the ground that what was published were expressions of comment and opinion privileged under the First and Fourteenth Amendments to the Constitution of the United States, or alternatively that the words are not actionable because they do not refer specifically to McMurry and his proof is inadequate to show that the words complained of related to him. We do not treat with these alternative grounds for sustaining the district court because of our conclusion that McMurry has failed to meet his burden of demonstrating evidence of actual malice at the summary-judgment stage, and therefore the judgment of the district court must be affirmed. The other issues then are not material to the disposition of the appeal.

The judgment of the trial court is affirmed.

1. Article 1, § 20, Wyoming Constitution provides in part:

   " * * * [I]n all trials for libel, both civil and criminal, the truth, when published with

ROONEY, Justice, specially concurring.

I have the same problem with the majority opinion in this case as I had with the majority opinion in the companion case of *MacGuire v. Harriscope Broadcasting Co.,* Wyo., 612 P.2d at 840 (1980).

That said in my special concurrence to that case is here applicable and is incorporated herein by this reference. Generally, I do not believe it proper for this court or the trial court to weigh the evidence at the summary judgment stage to determine whether it meets a standard of preponderance of the evidence, or convincing clarity, or any other standard. The question should be restricted to whether or not there exists an issue as to a material fact. The majority opinion disregards the oft-quoted proposition that:

> " * * * It is not the purpose of such a motion to decide the facts but to determine if any real issue exists * * * ." *Kover v. Hufsmith,* Wyo., 496 P.2d 908, 909 (1972). See *Timmons v. Reed,* Wyo., 569 P.2d 112 (1977); *Hunter v. Farmers Insurance Group,* Wyo., 554 P.2d 1239 (1976); *Knudson v. Hilzer,* Wyo., 551 P.2d 680 (1976); *Fegler v. Brodie,* Wyo., 574 P.2d 751 (1978).

As noted in my special concurrence to *MacGuire,* supra, "knowledge of falsity" involves a *subjective* awareness of the falsity of the statements, and "reckless disregard" involves sufficient evidence to permit an inference that the defendant must have, in fact, *subjectively* entertained serious doubts as to the truth of the statements. The United States Supreme Court has required the showing of "actual malice" for a public official to recover damages for defamatory statement, and "actual malice" can be shown by proving "knowledge of falsity" or "reckless disregard" for the truth. *New York Times Company v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Although truth is a defense in itself to a defamation action [1], the *New York Times*

good intent and [for] justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under direction of the court."

case has tied truth into the defense of "actual malice." The subjective "knowledge of falsity" requires the existence of "falsity." The subjective "reckless disregard" for falsity does not do so, and, if found to exist, the defense of truth is yet available to the defendant.

In any event, a review of the record in this case under the requirements set forth in my dissent to *MacGuire*, supra, does not reveal the potential for any evidence relative to the subjective "knowledge of falsity" or "reckless disregard" on the part of appellees. I must therefore agree only with the *result* reached by the majority opinion.

### APPENDIX A

### (COUNTS I AND II, AMENDED COMPLAINT)

"Back to the board

"The Natrona County International Airport Board continues to operate on a collision course. It is rudder-less, seeking a mooring but finding none, and out of control.

"Shocking new revelation is heaped upon revelation. It is apparent to the public that nothing is being done except patchwork of the most temporary sort.

"Arrogance, surliness, coupled to the persistent insistence that the airport operation is none of the public's business and just who does the press presume to be to question our operations? are the over-riding attitudes of several members of the Airport Board.

"We thoroughly dislike blanket indictements [sic] so we make it clear that we do not include Airport Board member Bob Heizer in this criticism.

"In the best ideals of public service, he was called upon to serve on the board and he accepted. We wonder now how often Mr. Heizer has pondered why he accepted this public trust and be subjected to the frustrations—essentially a voice alone—in attempting to provide some direction to a board hopelessly off course. He is trying to get these appointed board members he must work with to operate in a business-like manner for the benefit of the taxpayers.

"It is a difficult, if not hopeless, task.

"Some points of fact:

"Mr. Heizer, at a recent board meeting, was the only member who voted against the crazy patchquilt motion, which was approved, to validate all decisions made in executive (press barred) board meetings. Board minutes are incomplete but these executive sessions included leasing agreements for rental space, one of which involved a former board president, John MacGuire, who was recently 'rotated' to board member status. Mr. MacGuire operates his own minerals exploration business from a flight line hangar which was provided for years at bargain basement price.

"Mr. Heizer last Tuesday was again the lone dissenting voice when the other three board members—Jan Wilking, president; Neil McMurry, secretary; and members George Taylor and Mr. MacGuire—attempted to solicit a 'concrete proposal' from two firms considering the rental of airport land for the construction of industrial buildings.

"Mr. Heizer was attempting to make the eminently reasonable point that a public board should not engage in the treacherous practice of using public funds to enter the private sector of business.

"Mr. Heizer did not appear to get that point across to his colleagues on the board.

"The most shocking revelation that occurred at last Tuesday's board meeting was that the Airport Board met in executive session before the open meeting and voted pay raises for 11 airport employees. This action came two months before the salary increases were to be considered. Board President Jan Wilking and Kent George, airport manager, explained that the airport employees were threatening to resign as a body from the volunteer fire department.

"This is nothing more than bargaining with the gun at one's head. It is pure intimidation. Are all other county board members to adopt similar techniques when engaged in wage negotiations with county employes?

"How do other county employes feel about the actions of the Airport Board in caving in during salary negotiations, and what do they think about the salaries provided the Airport Board employes in light of their own talents, duties and responsibilities? A dangerous precedent has been set by the Airport Board.

"Mr. George also said that another reason for justifying the Airport Board's actions on the salaries was that the employes resented the implication that they had been stealing gasoline. This is no implication. County Attorney Dan Burke made this charge in his investigation of the airport operations. He said he could not file charges because they occurred several years ago and he had serious reservations about being able to make them hold in court.

"Mr. Burke concluded his superficial investigation of the airport operations with more questions posed than answered. This was before he tried to field the investigation to Attorney General Frank Mendicino, who fretted about it and then declined to do his job for some of the most politically obscure reasons we have ever heard.

"How can County Attorney Dan Burke investigate the operations of a board responsible for airport operations, which his uncle, County Commissioner Chairman John Burke essentially heads and who is a candidate for reelection. He is responsible for the actions of the airport and other boards. He appoints the members to county boards, with the concurrence of the other commissioners, Vern Rissler, a Demoratic candidate for State Senate and Dr. Nat Fowler.

"County Attorney Dan Burke did not even submit a report to Airport Board President Wilking or Airport Board Manager George, of his airport investigation with recommendations and conclusions, they claim.

"The troubles at the airport are deep. They are being treated quickly and cosmetically with no attempt to get to the source of the troubles.

"They began years ago by being a superboard; they have been compounded under the leadership of former Board President MacGuire. He performed essentially like a one-man band—hiring, firing, making administrative and policy decisions rubber stamped by the board. He remains reluctant to relinquish what he considers his prerogative.

"What is to be done?

"If the County Attorney and the Wyoming Attorney General obstinately refuse to do their public duty and determine just what is wrong with the airport operations, use public funds to employ private investigators. Give them a free hand to determine what is wrong with the operations and then let them make recommendations which must be carried out.

"There have been many things done right at the Natrona County International Airport, and it involved the efforts of many public spirited and dedicated individuals. This is the opinion of Dr. Harry Stuckenoff, a former Airport Board member whose viewpoint is published today on Page 5.

"Why not clear the air? It is, after all, the taxpayers' airport and they deserve to know how it operates today and how it has operated in the past. Then, get the board to chart a course."

## APPENDIX B

### (COUNTS III–V, AMENDED COMPLAINT)

"Must public be damned?

"How much ignorance of the law, coupled to arrogance, are the people of Natrona County going to be subjected to from its elected officials? We're referring to [sic] latest episode in a long series of eye-opening developments involving the elected Natrona County Board of County Commissioners, the appointed Natrona County Airport Board, and the Natrona County Attorney's office.

"In pure defiance of the open meetings' law, as clearly defined in Chap. 7.3, Meetings of Governmental Agencies, in the 1975 *Wyoming Statutes*, representatives of the three governmental bodies met Saturday

for what they euphemistally [sic] termed a 'work session.'

"The work session was a secret session. Any action taken at the secret session is null and void, as the County Commissioners, Airport Board and County Attorney should have indelibly inscribed in their minds by now. The public does not know what occurred at this work session.

"It was because of this arrogant ignoring of the law and conducting of unpublicized, secret—press and public barred—meetings that resulted in the Airport Board earlier having to rescind its actions and try and correct them by a resolution. Past actions included entering into a contract for hangar space with a member of the Airport Board and past president, John MacGuire, to lease space to conduct his private business.

"Despite these past actions, and loss of public confidence, it's obvious that the County Commissioners, Airport Board, County Attorney, and the Airport Board manager plan to continue to operate its policy of the public be damned.

"At the Saturday secret session, attended by County Commissioner Chairman John Burke, his nephew, County Attorney Dan Burke, and other members of both boards, County Commissioner Vern Rissler stated after the 'work session,' that it was apparent to him that no investigation of airport operations is necessary since an audit by an accounting firm showed nothing of importance remiss.

"Airport Board President Jan Wilking offered that he did not believe an independent investigation is necessary, a viewpoint he has steadfastly embraced. His argument: 'I don't think there is anything crooked out here,' the board president says.

"Mr. Wilking may not 'think' so—and that's hardly being assertive—but how can the public even begin to 'think' when it hasn't the facts and taxpayers' business and 'work sessions' are conducted in secret?

"If the letter of the open meetings law has not been violated, the spirit of it certainly has. But the taxpayer will really never know.

"How can a taxpayer know what decisions were really arrived at if the public and press are barred from a public meeting conducted a week ago Saturday in the morning? Alternatives, including political repercussions of conducting an investigation of the Airport Board, could have been discussed by the boards, procedures could well have been set, and all that awaits is a rubber-stamping of the secret session agreements.

"Such actions by elected and appointed officials are repugnant since they ignor [sic] public trust, duty and responsibility.

"It remains incomprehensible to us that the Airport Board, obviously with the approval of the County Commissioners and County Attorney, continues to operate as a separate entity. It indicates that the County Commissioners and County Attorney are afraid of what a private investigation might unearth.

The combined actions of the three boards is an arrogant extension of the public be damned attitude as expressed by Airport Board member MacGuire's succinct but obscene response of 'Screw 'em' when he was asked by the *Casper Star-Tribune* about his responsibilities to the public board.

"With the tacit approval of the County Commissioners, this will obviously continue to be the attitude of the Airport Board."

## APPENDIX C

### (COUNT VI, AMENDED COMPLAINT)

"Come clean, gentlemen

"Attorney General Frank Mendicino says that his office's criminal investigation division will not investigate alleged criminal activity at the Natrona County International Airport.

"He based his decision after lengthy discussions with several people, including Natrona County Attorney Dan Burke and says that it would be extremely difficult, if not impossible, for a purely professional criminal investigation to be conducted in the matter.

"He also notes that there are many currents running through the matter, which he does not understand, and he believes that any decision his Criminal Investigation Division would make would not be evaluated as a purely professional one.

" 'It's an absolute necessity, if the Criminal Investigation Division is to have any credibility with law enforcement agencies and the public,' Mr. Mendicino says, 'that this is to [sic] perceived as an agency which does not get involved in personalities or politics.'

"The state's highest law enforcement official then goes on to say in his fulsome explanation that by politics he does not mean partisan party politics but people politics, noting that if his Criminal Investigation Division is to have any credibility it has to remain outside of that arena.

"Nonsense! It has been some time since we came across such convulted [sic] reasoning. This is whitewash, but it simply will not wash.

"Mr. Mendicino not only takes the people for fools but belittles his own abilities and those employed by him. He has a department with an authorized strength of 65 fulltime and 15 parttime employes. His 1976–78 budget is a whopping $4.2 million and includes $1 million for investigation alone. Why does he dodge his duty behind a smokescreen of rhetoric? Here are the facts:

"It was almost one month ago—July 16 to be precise—that Natrona County Attorney Dan Burke announced that the State Attorney General's office will investigate the operations at the Natrona County International Airport. Mr. Burke said the investigation was warranted because of 'allegations' which ranged from theft of gasoline to misconduct by past airport board members or employes, misconduct on the part of some who have leased airport buildings, to alleged unauthorized sale of Alcova Irrigation District water.

" 'There may be criminality there,' Mr. Burke said.

"The County Attorney also said that his investigation would be conducted simultaneously with that of the State Attorney General's office. He even named the person who would be in charge: Neil Compton, under the direction of Attorney General Mendicino.

"Comes now Mr. Mendicino, after weeks of indecision, and apparently on the basis of some telephone calls, and he said on last Friday, the 13th, that there will be no investigation by his department. He admits to being confused but is reluctant to clear his confusion. Remember, this is despite Mr. Burke's repeated requests for such an investigation, and after his ended with additional serious questions posed but none answered and no charges filed. Mr. Burke said last Friday he did not agree with Mr. Mendicino's decision declining to conduct the investigation, but he could understand why he made it.

"We certainly do not understand Mr. Mendicino's reasoning and we sincerely doubt many Wyoming taxpayers do. This perhaps results from lacking the elusive perceptive powers apparently given only to public officials such as Mr. Mendicino or Mr. Burke who are charged with investigating improprieties, or worse, in the public's interest.

"Come to the point, gentlemen. Do your duty. Don't play the public for suckers. Is there anyone being protected? Do you feel you are incompetent to conduct such an investigation? Why is the state, with all its resources, incapable of conducting an impartial investigation? If it is, why not hire independent investigators if for no other reason than to clear the air?

"Level with the public, gentlemen. That's what you're paid for.

"As for Mr. Mendicino's tangled thoughts on personalities and politics, what else is involved in this matter—or indeed, living itself—other than personalities and politics? They govern our lives.

"As for personalities, naturally there are personalities involved, both Democrats and Republicans. Some are powerful personalities; some are not.

"As for politics, of course there are politics involved. For openers:

"County Attorney Dan Burke is a Republican. His uncle is County Commissioner John Burke, seeking reelection. He is also a Republican. County Commissioner Vern Rissler, a Democrat, is seeking election to the State Senate. Both are directly responsible for the actions and operation of the Airport Board.

"Attorney General Mendicino is surely no stranger to politics, people or otherwise. He was a Democratic member of the Wyoming House from Albany County. He abruptly withdrew shortly before the primary two years ago and left his supporters dangling and his party scrambling to come up with a candidate to fill the seat he vacated to devote his efforts toward the election of Ed Herschler as governor. After being left to cool in the hall for some time, Gov. Herschler appointed him his Attorney General. His ambitions now?

"And in case anyone has neglected to notice: The year is 1976 and a general election is underway.

"The ball—or rather the hot potato—has been passed by Mr. Burke to Mr. Mendicino and now back to Mr. Burke. Mr. Burke has been effectively been [sic] left out on the limb which Mr. Mendicino thinks he has sawn off. This is politics. It is certainly not those Mr. Mendicino talks about, in a peculiar display of reasoning, as not being partisan party politics but politics in a broader sense, as in people politics.

"Mr. Mendicino and Mr. Burke, let's not confuse the people any more.

"What is going on and why and what do you intend to do about it?

"A straight answer, please. The people deserve to know."