OIL, CHEMICAL AND ATOMIC WORK-ERS INTERNATIONAL UNION, John E. Foley, and Joseph M. Misbrener, Appellants (Plaintiffs),

v.

SINCLAIR OIL CORPORATION, a Wyoming and Delaware corporation, Earl Holding, individually and as Director and Officer of Sinclair Oil Corporation, J.R. McIntire, individually and as Refinery Manager and employee of Sinclair Oil Corporation, and John Doe(s), whether singular or plural, that individual or those individuals who participated in the republishing of the defamatory statement, Appellees (Defendants).

No. 86–239.

Supreme Court of Wyoming.

Dec. 22, 1987.

Richard Rideout, of Freudenthal, Salzburg, Bonds & Rideout, Cheyenne, and Donald J. Mares, of Law Office of John W. McKendree, Denver, Colo., for appellants, argument by McKendree.

Glenn Parker and James Applegate, of Hirst & Applegate, Cheyenne, and Dan S. Bushnell, of Kirton, McConkie & Bushnell, Salt Lake City, Utah, for appellees, argument by Messrs. Applegate and Bushnell.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT, and MACY, JJ.

CARDINE, Justice.

The stakes were high. The union, OCAW, and Sinclair Oil Corporation were locked in a contest for votes of Sinclair employees in a union decertification election. As expected, each party was commendably zealous in free and open debate presenting their respective positions. A letter, critical of the union and its officers, written by a former employee of OCAW, was circulated among Sinclair employees. OCAW lost the election. An action for damages, claimed to result from defamation by the letter, was brought against Earl Holding and other officers and representatives of Sinclair. OCAW and its officers lost the lawsuit by summary judgment. They now appeal to this court, raising the following issues: (1) whether the trial court erred in applying a subjective definition of actual malice and an evidentiary standard of convincing clarity; (2) whether the trial court erred in refusing to strike a supplemental memorandum and appendix filed by appellees in support of their motion for summary judgment; (3) whether the trial court erred in ruling that questions propounded to certain witnesses sought information which was protected by the attorney-client privilege; (4) whether the trial court erred in granting appellees' motion for summary judgment because of the existence of credibility issues; (5) whether factual issues existed which precluded summary judgment; (6) whether the trial court improperly relied upon incompetent testimony of appellants Misbrener and Foley; and (7) whether the trial court erred in concluding as a matter of law that significant portions of the alleged defamatory letter constituted protected opinion.

We affirm.

## FACTS

The present controversy concerns events surrounding a 1984 union decertification election held at the Sinclair Oil Corporation refinery in Sinclair, Wyoming. Prior to the election, Local 2–269 of the Oil, Chemical and Atomic Workers Union (OCAW) was the exclusive bargaining agent for employees at the Sinclair Refinery. Appellant Oil Chemical and Atomic Workers International Union (OCAWIU) is the international union with which the local union was affiliated.

From 1972 to 1983, Dorothy Palacios was employed by OCAWIU as an international representative. Early in 1983, appellant John "Jack" Foley, her supervisor, asked her to conduct research in the southern California area to obtain information which might be helpful to the union in negotiations with the Sinclair Refinery. Specifically, the union sought information concerning the Sinclair corporation, refinery owner Robert Earl Holding, and other businesses in which Holding had an interest.

In accordance with her instructions, Ms. Palacios traveled to San Diego and conducted a search of public records. She also visited the Westgate Hotel in San Diego, an enterprise owned by appellee Holding or one of his entities. While at the hotel, she happened to meet Mr. Holding and spoke with him briefly. Ms. Palacios then prepared a report on her investigation and submitted it to appellant Joseph M. Misbrener, who at that time was the vice president of the union.

In August of 1983, Ms. Palacios filed a harassment grievance against OCAW. In September, she was terminated as an employee of OCAWIU. Following her termination, she filed an unfair labor practice charge with the National Labor Relations Board (NLRB) and a discrimination complaint with the Equal Employment Opportunity Commission. Ms. Palacios then contacted appellee Holding and apologized for conducting the 1983 investigation. She also asked him for assistance in finding counsel to represent her in her grievances against the union. In a letter to Mr. Holding dated January 10, 1984, she made the following statements:

> "It is difficult for me to ask for help, but I find it now necessary as I have discovered that it is indeed not simple to find the proper attorney to take such a case. * * * It is, though, with the thought that you, too, should benefit and that, perhaps, aspects of the case will surface which may be of help to you in your association with that organization and I would have it understood with the attorney that any material that arose would be available to you and not submerged by the usual fiduciary attorney/client relationship."

In response to this letter, Ms. Palacios received a call from Daniel Gruender, an attorney whose firm represented Sinclair Oil and several of Holding's entities. Ms. Palacios was aware that Mr. Gruender's firm represented Sinclair. Mr. Gruender eventually agreed to represent Ms. Palacios in her grievance against OCAWIU. At the same time, he and his firm were involved in the proceedings at the Sinclair Refinery.

Ms. Palacios learned from Mr. Gruender that a decertification election was to be held at the Sinclair Refinery in April of 1984. The purpose of the election was to allow the union members to determine whether OCAW should be decertified as the bargaining agent for the refinery employees. Ms. Palacios then authored the following letter addressed to the OCAW-represented employees of the Sinclair Refinery:

"It has come to my attention that you are preparing for an election on April 26, 1984. *There are some facts you should know.*

"For nearly 12 years, I had been an International Representative for OCAW; I wish that I could praise the union, but, sadly, I cannot. Having experienced, personally, flagrant violation of my rights by OCAW as a union member; as a professional employee of OCAW; as a dues payer to an OCAW Local (also, the Staff Union, IRCU); and as a USA citizen, I was obligated to file a discrimination/harassment grievance against the OCAW Administration which so angered them that I was terminated from my employment one month later. For public record, both EEOC and NLRB charges have been filed against OCAW. This, of course, is my personal problem. *The subject of serious concern to you follows:*

"One of the assignments I was given as an International Representative for OCAW was to research records and background of your employer, Robert Earl Holding. This assignment came to me from Joe Misbrener, now International President of OCAW, through his Assistant, Dean Alexander, to District 1 Director Jack Foley. Foley told me (quote verbatim) ... 'Dig up all the dirt you can find on this guy. Joe needs to get something on him ... they're having some trouble with Sinclair.'

"I found this 'assignment' distasteful, insulting and offensive since I considered myself a qualified organizer and not a vulgar spy for those who must ply their trade by trashy, unethical practices ... nor did I aspire to be a 'digger of dirt.' However, I admit that I rationalized that, after all, I was accepting my salary and was obliged to carry out the assignment as instructed by my employer. I performed the investigation with care and extreme diligence. Guess what?

"THE INVESTIGATION REVEALED ABSOLUTELY NOTHING EITHER BAD OR EVEN REMOTELY UNSAVORY ABOUT MR. HOLDING! TO THE

CONTRARY ... I FOUND ONLY VERY GOOD REPORTS ABOUT HIM!

"OCAW must have been displeased by this fact because I never had *one word* from *any* of them *nor even one comment* regarding the 12–page report I sent to Misbrener via certified mail. I received only the returned receipt showing proof of delivery.

"My investigation led to acquaintance with many of Mr. Holding's employees. When I, tactfully, led the conversation to the subject of the union, I was told by the employees that they were not sorry for having decertified the union two years earlier. Admittedly, I was surprised to hear this from the employees. "They spoke of Mr. Holding and his family with warm enthusiasm and genuine sincerity. They assured me that Mr. Holding was a man of integrity whose word was as iron-clad, as binding, as any union contract!

"Neither could I find, though I searched, any employee who suffered any loss as a result of eliminating the union. That these employees so respected, even revered, their employer aroused my curiosity. They had made it very clear to me that they were not about to reorganize with the union ... to turn their backs on an employer who treated them well ... even after two years of having been without a union.

"Released from my employment by OCAW, I am now free of any obligation to remain silent about that investigation. I could not have addressed you as I am now doing while I was still on the union's payroll. Neither, ordinarily, would I voluntarily write to a group of employees about union assignments. In this case, however, I was part of an action intended, undeservedly, to malign your employer and I want to take part in clearing the record.

"That 'assignment' proved to be a turning point in my life and I was forced to reason ... not rationalize ... about this shabby, low affair of 'digging dirt' or 'throwing mud' to attempt to smear a gentleman of excellent character ... as verified by his own workers. Was *this* why I had joined the union? Certainly not! Mr. Holding doesn't know me nor does he need my testimonial to any virtue he possesses; but I felt the need to apologize *for* OCAW. The leadership has abdicated any sense of decency in their desperation to keep their political boat afloat.

"Honest union leaders do not need to 'dig dirt' nor stoop to the foul play to which I've been exposed in the last years of my employment by OCAW. Why do OCAW so-called leaders need to 'dig dirt'? Were they planning blackmail, presuming to call it 'negotiations'? Was this the intent of such 'investigation'? I do not know. I know only this fact: while, I repeat, there was not one mark against the Holdings, THE GOOD WAS HIGHLY VISIBLE!

"If I were a Sinclair employee, I'd encourage productivity for the benefit of everyone, and I'd give Mr. Holding an opportunity to work unhampered by any 'dirt-seekers.'

"Remember, foul 'leadership' leads where you cannot afford to follow and taints all those connected to it. I used to believe that you could remain above it, stay clear of the 'mud.' Not so. Some of it always sticks to your fingers and is hard to clean off.

"Good luck in your election!

"/s/

"Dorothy A. Palacios

"Former Int'l. Rep.—OCAWIU" (Emphasis in original.)

Ms. Palacios testified that while no one had requested her to prepare the letter, she mailed it to Mr. Gruender and told him he could use it if it would be helpful. She also provided to Mr. Gruender a copy of the report of her investigation of Mr. Holding and a copy of the telegram from OCAWIU requesting that she perform the assignment.

Daniel Gruender delivered the letter to the management of the Sinclair Refinery. Several meetings were then held to determine whether to distribute the letter to Sinclair employees. Daniel Gruender took

part in these discussions. Appellee Holding and other Sinclair personnel asked the Rawlins Daily Times to publish the letter, but the newspaper declined. The next morning, Daniel Gruender and others again met with representatives of the Daily Times. The newspaper then contacted Dorothy Palacios and the union representatives to discuss the letter's contents, and eventually printed an article containing excerpts from the letter. On the evening before the decertification election, appellees distributed the Palacios letter to Sinclair employees, along with a cover letter authored by appellee J.R. McIntire. OCAW lost the election the next day.

On February 22, 1985, appellants filed a complaint against appellees, alleging libel and civil conspiracy. After considerable discovery had been conducted, appellees filed a motion to dismiss or, in the alternative, for summary judgment. Appellants then filed a motion to compel discovery, challenging appellees' assertions of the attorney-client privilege. On February 28, 1986, the trial court entered an order sustaining many of appellees' attorney-client privilege objections. After further discovery was conducted, the court granted appellees' motion for summary judgment. In a decision letter, the court indicated that appellees were entitled to summary judgment for two reasons. First, the court concluded that appellants had failed to demonstrate with convincing clarity that appellees acted with actual malice in publishing the alleged defamatory material. Second, the court ruled that as a matter of law the alleged defamatory material consisted of nonactionable opinion. Either one of the alternative rulings, if correct, provided a sufficient basis for the entry of summary judgment against appellants. We affirm the trial court's conclusion that appellants failed to provide clear and convincing evidence to demonstrate actual malice.

## I. ACTUAL MALICE

■ In the crucible of a labor conflict, clashes between the right of free discussion and one's right to be free from defamation are virtually inevitable. This problem was addressed by the United States Supreme Court in *Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). In *Linn,* the Court was faced with the question of whether, and to what extent, the National Labor Relations Act preempted the availability of state remedies for libel. In striking a balance between the "congressional intent to encourage free debate on issues dividing labor and management" and the " 'overriding state interest' in protecting its residents from malicious libels," the Court concluded that in the labor dispute context, state libel remedies were available only if a plaintiff could demonstrate actual malice. Id., 86 S.Ct. at 664. The Court thus adopted "[t]he standards enunciated in *New York Times Co. v. Sullivan,*" 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

In *New York Times Company v. Sullivan,* the Court defined "actual malice" as libel issued "with knowledge that it was false or with reckless disregard of whether it was false or not." Id. 84 S.Ct. at 726. In a subsequent case, the Court stated that in order to show reckless disregard, a plaintiff must provide "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); see also *Adams v. Frontier Broadcasting Company,* Wyo., 555 P.2d 556 (1976); *MacGuire v. Harriscope Broadcasting Co.,* Wyo., 612 P.2d 830 (1980).

As explained in *McMurry v. Howard Publications, Inc.,* Wyo., 612 P.2d 14, 18 (1980), the New York Times actual malice standard is a subjective one which focuses on the defendant's state of mind:

" 'knowledge of falsity' involves a *subjective* awareness of the falsity of the statements, and 'reckless disregard' involves sufficient evidence to permit an inference that the defendant must have, in fact, *subjectively* entertained serious doubts as to the truth of the statements." (Emphasis in original.) Rooney, J., specially concurring.

Appellants argue that while this subjective definition of actual malice is appropriate in cases involving media defendants, it is inappropriate in cases involving labor disputes. We find no merit in this contention. The actual malice standard is applied in media-defendant cases to protect the principle that "debate on public issues should be uninhibited, robust, and wide-open * * *." *New York Times v. Sullivan*, supra, 84 S.Ct. at 721. This principle applies with equal force in the labor dispute context. In *Linn v. United Plant Guard Workers of America, Local 114*, supra, 86 S.Ct. at 663, the Supreme Court said:

> "We acknowledge that the enactment of § 8(c) [of the NLRA] manifests a congressional intent to encourage free debate on issues dividing labor and management. And, as we stated in another context, cases involving speech are to be considered 'against the background of a profound * * * commitment to the principle that debate * * * should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks.' *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). Such considerations likewise weigh heavily here; the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth." (Footnote omitted.)

Moreover, the case law of other jurisdictions provides abundant support for the proposition that the New York Times subjective actual malice standard, as refined by *St. Amant v. Thompson*, supra, applies in the labor dispute context. See *Tosti v. Ayik*, 394 Mass. 482, 476 N.E.2d 928, 935 (1985); *Raffensberger v. Moran*, 336 Pa. Super. 97, 485 A.2d 447, 453 (1984); *Meuser v. Rocky Mountain Hospital*, Colo. App., 685 P.2d 776, 779 (1984); *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 6 Ohio St.3d 369, 453 N.E.2d 666, 669 (1983); *Montana v. Smith*, 92 A.D.2d 732, 461 N.Y.S.2d 603, 604 (1983). We hold that the trial court correctly applied the actual malice standard.

## II. CONVINCING CLARITY

In determining whether appellants provided sufficient evidence to defeat appellees' motion for summary judgment, the trial court applied the evidentiary standard of convincing clarity. Appellants claim that the trial court erred in applying this standard. We disagree.

■ The requirement that a plaintiff must demonstrate actual malice with convincing clarity was articulated in *New York Times Company v. Sullivan*, supra. In *Linn v. United Plant Guard Workers of America, Local 114*, supra, the Court stated that the "standards" enunciated in New York Times Company apply in libel cases involving labor disputes. *Linn*, supra, 86 S.Ct. at 664. Thus, the clear and convincing standard is appropriate in this case. See *Meuser v. Rocky Mountain Hospital*, supra.

In *Adams v. Frontier Broadcasting Co.*, supra, 555 P.2d at 562, we said that

> "[i]n ruling upon the presence of a genuine issue of fact as to the existence of actual malice the trial judge must decide whether:
>
> "[T]he plaintiff has offered evidence of a *sufficient quantum to establish a prima facie case*, and the offered evidence *can be equated with the standard or test of "convincing clarity"* prescribed by United States Supreme Court decisions * * *.' *Chase v. Daily Record, Inc.*, 83 Wash.2d 37, 43, 515 P.2d 154, 157 (1973).
>
> "Accord, *United Medical Laboratories v. Columbia Broadcasting System, Inc.*, 404 F.2d 706 (9th Cir.1968), cert. den. 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Buchanan v. Associated Press*, 398 F.Supp. 1196 (D.D.C.1975)."

See also *MacGuire v. Harriscope Broadcasting Co.*, supra, 612 P.2d at 832. The United States Supreme Court approved this approach to summary judgment in cases falling under the New York Times Company rule in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Anderson*, the Court explained that the requirement of clear and convinc-

ing evidence of actual malice was appropriate at the summary judgment stage because "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." 106 S.Ct. at 2512.

The trial court did not err in requiring appellants to provide clear and convincing evidence of malice in order to defeat appellees' summary judgment motion.

## III. REFUSAL TO STRIKE

■ Appellants next contend that the trial court erred in refusing to strike appellees' supplemental memorandum in support of their motion for summary judgment because it contained misleading, scandalous and impertinent material. They also contend that the court erred in not striking as untimely filed an appendix filed in support of the supplemental memorandum. We will not address these contentions at length because even if we assume that the trial court erred in denying appellants' motion to strike and we disregard the materials in the disputed documents, the outcome of this appeal would not be affected.

Appellees' initial memorandum and supporting documents, filed months before the summary judgment hearing, provided sufficient evidence to establish the absence of a genuine issue of material fact on the dispositive question of whether appellees acted with actual malice. Those materials demonstrated that appellees believed the contents of the Palacios letter because of telephone conversations in which Ms. Palacios apologized for conducting the investigation, her letter asking for assistance in finding an attorney, and the telegram describing the assignment. Our discussion here is confined to that portion of the letter in which Ms. Palacios quotes appellant Foley as stating "[d]ig up all the dirt you can find on this guy. Joe needs to get something on him ... they're having some trouble with Sinclair." Ms. Palacios' statement that Foley said these words is clearly a statement of fact. The entire remainder of the letter either consists of factual asser-

tions which are not defamatory or statements which are treated as nonactionable opinion in the labor dispute context.

"[W]here potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbóle, language which generally might be considered as statements of fact may well assume the character of statements of opinion." *Gregory v. McDonnell Douglas Corporation*, 17 Cal.3d 596, 131 Cal.Rptr. 641, 644, 552 P.2d 425, 428 (1976).

Appellees met their burden under Rule 56, W.R.C.P. even without the materials in the supplemental memorandum and appendix. Cf. *Hickey v. Burnett*, Wyo., 707 P.2d 741 (1985).

Simply stated, the trial court's refusal to strike appellees' supplemental memorandum and appendix did not rise to the level of prejudicial error.

## IV. ATTORNEY–CLIENT PRIVILEGE

During the course of discovery, appellees continually asserted the attorney-client privilege in response to virtually all questions regarding communications made in the presence of attorney Daniel Gruender. These communications can be divided into two categories: (1) communications between Dorothy Palacios and Daniel Gruender; and (2) discussions among Daniel Gruender and Sinclair personnel, including appellees Holding and McIntire, concerning the decision to distribute the Palacios letter.

■ With respect to the first category, appellants argue that Dorothy Palacios expressly waived the attorney-client privilege by the language contained in her letter to appellee Holding dated January 10, 1984. The attorney-client privilege is limited to

"those communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as so intended. * * * Wherever the matters communicated to

the attorney are intended by the client to be made public or revealed to third persons, obviously the element of confidentiality is wanting." E. Cleary, McCormick on Evidence, § 91 at 217 (3d Ed. 1984).

An exception to this rule arises when the same attorney represents two clients who share information on a matter of common interest:

"When two or more persons, each having an interest in some problem, or situation, jointly consult an attorney, their confidential communications with the attorney, though known to each other, will of course be privileged in a controversy of either or both of the clients with the outside world, that is, with parties claiming adversely to both or either of those within the original charmed circle." McCormick, supra, at 219.

The classic example of this joint client exception occurs when two clients "walk into the lawyer's office together and retain him to represent both of them in the same matter." C. Wright and K. Graham, Federal Practice and Procedure: Evidence § 5505 at 556. Although this did not happen in the present case, Dorothy Palacios and appellees shared the same attorney, and a significant identity of interest existed between them. As stated by appellants in their brief, appellee Holding and Dorothy Palacios engaged in a "joint effort to fight the OCAWIU." We hold that the joint client exception applies under these circumstances. The district court did not err in ruling that the communications between Dorothy Palacios and Daniel Gruender were protected by the attorney-client privilege, nor did the ruling result in injustice or in the judgment entered being a sham.

■ With respect to the second category of questions, those which relate to meetings held in the presence of Daniel Gruender in the days before the decertification election, appellants assert that the appellees waived the attorney-client privilege by raising malice as an affirmative defense and by asserting that the decision to publish the letter was made with advice of counsel.

Appellants have cited no authority to support the proposition that a libel defendant waives the attorney-client privilege by raising lack of malice as a defense. They argue, however, that "malice has been made an issue by the affirmative acts of the Appellees, as well as potentially by operation of law," and that in the interest of fairness all attorney-client communications which are relevant to the malice issue should be discoverable.

We find no merit in appellants' contention that malice became an issue as a result of appellees' "affirmative acts." When, as in this case, malice is an element of a libel action, the burden of pleading and proving that element rests on the plaintiff. R. Smolla, Law of Defamation, § 3.06 (1986). Consequently, malice became an issue in this case when appellants filed their complaint.

■ We are also unpersuaded by appellants' argument that appellees waived the attorney-client privilege by stating during discovery that their decision to publish the Palacios letter was made with the advice and assistance of counsel. We recognize that reliance upon a defense of advice of counsel has, in some circumstances, been held to constitute a waiver of the attorney-client privilege. See, e.g., *United States v. Mierzwicki*, 500 F.Supp. 1331 (D.Md.1980). In this case, however, appellees did not rely on advice of counsel as a defense. They merely stated, in response to questions posed by appellants' counsel, that Daniel Gruender participated in the decision to publish the Palacios letter and helped prepare a cover letter for it. We reject appellants' assertions that these discovery responses amounted to a waiver of the privilege.

■ Appellants next contend that the attorney-client privilege does not apply to many of the communications at issue because they involved contemplated tortious acts. In *Hopkinson v. State*, Wyo., 664 P.2d 43, 66–67 (1983), we held that the privilege is inapplicable to communications made to further a crime or fraud. Although some jurisdictions have enlarged

the crime or fraud exception to include contemplated torts, the wisdom of this expansion of the exception has been questioned.

> "Broadening the exception in such ways might lead, at least initially, to greater disclosure (more evidence with which to get at the truth), but in the long run surely the effect would be to discourage clients from attempting to conform their conduct to legal requirements and to discourage lawyers from seeking information from clients in order to advise them effectively * * *." 2 D. Louisell and C. Mueller, Federal Evidence § 213 at 823–824.

We find this reasoning persuasive, and we decline to adopt an exception to the attorney-client privilege for contemplated tortious acts.

Finally, appellants assert that the trial court upheld the privilege in several situations in which appellants' discovery questions did not seek information concerning legal advice of an attorney while acting as an attorney. This assertion is unsupported by the record. All the questions in which the assertion of the attorney-client privilege was upheld required answers concerning communications made in the presence of Daniel Gruender while providing advice to his clients.

## V. ISSUES OF MATERIAL FACT

Appellants contend that the trial court erred in granting summary judgment because significant issues of fact existed concerning the credibility of appellees Holding and McIntire. In support of this argument, appellants point to two purported inconsistencies. First, in their affidavits, appellees Holding and McIntire stated that their belief in the truth of the contents of the Palacios letter was based upon information contained in a telegram from appellant Foley and a copy of Dorothy Palacios' report on her investigation, while in their answers to appellants' interrogatories they added additional factors they relied upon. Second, appellees Holding and McIntire stated in their affidavits that the decision to publish the letter was made by themselves while their answers to interrogatories indicate that they consulted with Daniel Gruender before making the decision.

This court has noted that summary judgment may not be proper when an action involves issues concerning state of mind and credibility. *Bryant v. Hornbuckle*, Wyo., 728 P.2d 1132 (1986). We have also stated that "[i]f the evidence presented * * * does not raise sufficient doubt of an affiant's credibility, a party's desire to test his statements by a jury will not preclude summary judgment." Id. at 1137.

The United States Supreme Court addressed this issue as it relates to libel cases in *Anderson v. Liberty Lobby, Inc.,* supra, in which the Court made the following observations:

> "Respondents argue * * * that whatever may be true of the applicability of the 'clear and convincing' standard at the summary judgment or directed verdict stage, the defendant should seldom if ever be granted summary judgment where his state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue. They rely on *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), for this proposition. We do not understand *Poller,* however, to hold that a plaintiff may defeat a defendant's properly supported motion for summary judgment in a conspiracy or libel case, for example, without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of * * * legal malice. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Id., 106 S.Ct. at 2514.

We conclude that purported inconsistencies in appellees' testimony did not create a genuine issue of material fact.

■ Appellants assert that apart from the purported credibility issues, other issues of fact exist on the question of actual

malice. While they contend that the evidence demonstrates several factors to support a finding of actual malice, in our view the only evidence which might arguably support such a finding is appellees' knowledge that Dorothy Palacios, the author of the letter, was biased against the union. Appellees' knowledge of her ill will toward appellants, however, does not by itself prove knowledge of probable falsity of the alleged defamatory statement, *Hotchner v. Castillo–Puche*, 551 F.2d 910, 913–914 (2nd Cir.1977); see also *Loeb v. New Times Communications Corp.*, 497 F.Supp. 85, 92–93 (S.D.N.Y.1980), nor does it impose on appellees "an additional burden of extensive independent investigation." *Loeb v. New Times Communications Corp.*, supra, n. 12. The district court did not err in concluding that no genuine issue of material fact existed on the question of whether appellees acted with actual malice.

## VI. INADMISSIBLE TESTIMONY

Finally, appellants assert that the trial court erroneously relied upon inadmissible testimony in entering summary judgment for appellees. Specifically, appellants assert that the following deposition testimony was inadmissible on the grounds of foundation and competency:

"Q: 'Now is there any specific act of malice or recklessness or wanton conduct that you think were [sic] committed by Sinclair or by Mr. Holding or Mr. McIntire other than circulation of the two letters?

[Objection omitted.]

"A: 'I know of no other action that attaches to me personally, no ...' "

Relying on this testimony, the trial judge stated in his opinion letter that he found it "dispositive" that "both plaintiffs Foley and Misbrener acknowledged that neither knew of any act or statement on the part of Sinclair, Holding, or McIntire which would indicate malice or recklessness on the part of defendants, other than circulation of the Palacios letter." Appellants correctly point out that there is nothing in the record to

indicate that Foley and Misbrener knew the meaning of the legal terms contained in the question quoted above. Accordingly, we do not find it dispositive that appellants admitted in their depositions that they were unaware of any evidence to support a finding of actual malice. The dispositive issue is whether any evidence in the record before us supports such a finding, applying the evidentiary standard of convincing clarity. The record is devoid of such evidence; and, as a result, we affirm the district court.

Affirmed.

URBIGKIT, Justice, dissenting.

The court here determines that granting defendant Sinclair's motion for summary judgment was proper because the Union, as plaintiff, did not show actual malice as a subjective criterium when focused on the state of mind of the defendant's decision-makers in questioning whether affidavit and deposition evidence was sufficient to establish a triable issue of fact. However, the reason why the Union could not show malice is the crux of this case: the attorney-client privilege, and whether it was properly applied in denial of plaintiff's discovery. In rejection of that pre-motion hearing discovery, the majority finds no waiver of the privilege, and relies on three theories: (1) the joint-client exception; (2) the raising of malice as an affirmative defense; and (3) the advice of counsel.

I dissent, and would find the malice evidence as hidden information to be discoverable because the data is necessary for review by the court in decision on defendant's summary-judgment motion. The proof necessary for the Union to respond to the motion was extrapolated to be undiscoverable under a collusive shield of attorney-client privilege, since the two parties, by agreement, happened to "coincidentally" employ the same attorney. Conversely to that immunization, I would apply a rule of necessity to determine privilege and discoverability.[1]

---

1. To change the scenario and contemplate that the disillusioned author of a critical election-

date attack in a labor conflict vote had been employer's agent, or even an investigator re-

Admissibility at trial is not of proper present focus, since the litigation proceeded only to the summary-judgment level and is consequently to be reviewed against the backdrop of such criteria. Factually, Sinclair moved for a motion to dismiss or in the alternative for summary judgment, with supporting affidavits. At that point, the burden shifted, and it became incumbent on the Union as the respondent to show there were material issues of fact. In *Cordova v. Gosar*, Wyo., 719 P.2d 625, 636 (1986), this court cited *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and expressed the view that:

> " ' * * * [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. [Citations.] In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a *genuine issue for trial*." Fed.Rule Civ.Proc. 56(e) (emphasis added.)' "

The information of what occurred must be evaluated in the light of the facts surrounding the parties when this court examines the entire record, *Wyoming Insurance Department v. Sierra Life Insurance Co.*, Wyo., 599 P.2d 1360 (1979), and considers this record from the viewpoint favorable to the party opposing the motion, the respondent. *Greenwood v. Wierdsma*, Wyo., 741 P.2d 1079 (1987); *DeHerrera v. Memorial Hospital of Carbon County*, Wyo., 590 P.2d 1342 (1979).

The crucial question in this case becomes: how can the Union develop *specific facts* showing that there is a genuine issue for trial and thus defend against the summary-judgment motion filed by the defendants in the defamation action? The very nature of this suit commands that malice in publication is intrinsically involved. Conse-

quently, to respond to the motion, the Union tried to discover the character of the conduct that the defendants engaged in— the character of the conduct which was inherently involved in the preparation of the joint representation and activity with their common attorney who, by the defendants' own admission, participated in the decision to publish the letter. This discovery was subsequently denied on the basis of attorney-client or, more appropriately, "attorney-clients" privilege, which justifies the summary judgment after the Union was foreclosed from discovering the facts necessary to refute the summary-judgment motion. The theoretical validity of a limited privilege as enunciated by this court in *Greenwood v. Wierdsma*, supra, is justified even more by the factual parameters of this case.

By holding as they do, when the state of mind of the parties is at issue, the majority put their stamp of approval on the approach here taken that the subjective intent of the parties can be hidden by employing a common attorney and using the attorney-client privilege. A defendant can subsequently move for summary judgment and thwart the nonmoving party from discovering the facts necessary to fight such a motion. The underlying facts are permitted to be concealed, with the spoils going to the party who secreted them. Such a practice I cannot condone. The persuasive philosophy on the comparable Shield Law privilege-discovery dispute as elucidating fundamental constitutional concerns in *Hatchard v. Westinghouse Broadcasting Co.*, Pa., 532 A.2d 346 (1987), affords precedential support for discovery in this case.

The majority correctly point out that malice is an element of the libel and thus the burden of pleading and proving that element rests on the plaintiff, and became an issue when the Union filed their complaint. However, the defendants, by affirmative acts, did place lack of malice in issue. The

---

tained by the employer's law firm, and who, after jumping ship, was led in employment-contract dispute to be represented by the Union's lawyers—would even-handed justice still envelop a malice issue by insulation of privilege in favor of the Union, or would the happenings

between the employee and his new-found lawyers be discoverable in the suit between the employer and the Union, whether founded in libel, slander or perhaps intentional interference with a contract?

defendants in their answers to the amended complaint list 16 separate defenses, five of which directly refer to lack of malice on their part:

"21. As a further and separate defense, Defendants allege that they, at no time bore any malice or ill will toward Plaintiffs or any of them, but acted in full belief of the truth and verity of the statements in the Palacios letter.

\*       \*       \*       \*       \*       \*

"25. As a further and separate defense, Defendants allege that the matters complained of are privileged under the guarantees of the First and Fourteenth Amendments to the Constitution of the United States and Article 1, Section 20 of the Constitution of the State of Wyoming because Plaintiffs are public figures and the subject publication was not made with any malice, or intent to harm the Plaintiffs.

"26. As a further and separate defense, Defendants allege the matters complained of are privileged in that the subject publication involves matters of public interest and was not made with any malice, or intent to harm the Plaintiff.

"27. As a further and separate defense, Defendants allege that the matters complained of are privileged in that any publication made by these Defendants to other persons was upon a subject in which both have an interest and was not made with any malice, or intent to harm the Plaintiffs.

"28. As a further and separate defense, Defendants allege that the statements complained of were published in the course of a labor dispute and as such are privileged and immune for a libel claim since they were not published with actual malice, nor with knowledge of their falsity nor with reckless disregard of whether they were true or false nor were the Plaintiffs injured thereby."

Recently, some courts have taken a more justice-interest view of the placing-at-issue waiver of the attorney-client privilege, by applying what has been labeled as the *Hearn* analysis. *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash.1975); *United States v.*

*Exxon Corporation,* 94 F.R.D. 246 (D.D.C. 1981). See also *Developments in the Law, Privileged Communications,* 98 Harv.L. Rev. 1450, 1641 (1985). In *Hearn v. Rhay,* supra, the court applied a tri-part test to determine if the attorney-client privilege can be waived with respect to pleaded matters when defendants claimed they acted in good faith and without malice. The *Hearn* test includes three criteria for utilizing the placing-at-issue waiver: the privilege-holder must (1) assert the privilege through some affirmative act which puts the protected information at issue; (2) through this act the asserting party puts the information at issue and renders it relevant to the action; and (3) by applying the privilege the opposing party would be denied access to privileged matter that is vital to the opposing party's defense. *Hearn v. Rhay,* supra, 68 F.R.D. at 581. Additionally, the court in *United States v. Exxon Corporation,* supra, used the *Hearn* test to hold that the oil company had waived its attorney-client privilege in an action to recoup overcharges in the sale of oil when Exxon raised the defense of good-faith reliance on the Department of Energy's representations. In *Exxon,* as in the instant case, the purpose of the discovery was to determine facts which required delving into the subjective intent of the parties, and, as well, the attorney-client privilege was used as a shield to this discovery.

" \* \* \* Thus, the only way to assess the validity of Exxon's affirmative defenses, voluntarily injected into this dispute, is to investigate attorney-client communications where Exxon's interpretation of various DOE policies and directives was established and where Exxon expressed its intentions regarding compliance with those policies and directives. There is no other reasonable way for plaintiff to explore Exxon's corporate state of mind, a consideration now central to this suit." *Exxon v. United States,* supra, 94 F.R.D. at 249.

The situation in the case at bar is especially suited to the Hearn analysis because at the heart of the *Hearn* court's decision was the manifest unfairness of permitting

a party to both assert information through some affirmative act for his own benefit, and to deny his opponent access to the very evidence that might refute or allow defense of this information. *Hearn v. Rhay,* supra, 68 F.R.D. at 581. Similarly, the case at bar presents a scenario where such manifest injustice did occur from such a practice.

An application of this *Hearn* analysis does not necessarily open up a Pandora's box of everything becoming unprivileged.

> "The anticipatory waiver theory concerns itself solely with the decision, whether by plaintiff or defendant, to commit to a course of action that would require the disclosure of privileged material. A defendant who answers a complaint with a general denial has not committed himself to such a course, because he bears no initial burden of going forward with evidence. Pleading an affirmative defense, however, if the defense can be established *only* with privileged evidence, will waive the defendant's privilege. The critical choice being exercised by the pleader is not whether to sue or defend, but whether to do so with privileged evidence. The decision to use privileged evidence should create a waiver of the evidence so disclosed and of any other evidence with regard to the same subject matter." 98 Harv.L.Rev. at 1643.

Sinclair asserted through five separate defenses that it had no malice when it published the letter. Consequently, by asserting this view in its answer to the amended complaint rather than a general denial, under the *Hearn* analysis the attorney-client privilege was waived, and the material became discoverable.

Additionally, there is great injustice in permitting the defendants to collusively hide the information and in effect deprive a court of the information it needs to avoid improperly terminating the case by summary judgment. A litigant should be permitted to diligently pursue discovery for the court to have the necessary information to effectuate a valid summary-judgment disposition.

The rule of necessity should be utilized to develop and reveal the information through discovery needed for the initial review by a court in a summary judgment proceeding.

> "The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played." *Williams v. Florida,* 399 U.S. 78, 82, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

Without this necessary information, the court is effectively presented with only one hand to examine, and the use of the privilege under this joint representation arrangement results in summary-judgment disposition becoming hardly more than a sham.

Unsettled by review of the comprehensive briefing and detailed record, and without defined opinion about what trial results might be, it is my conclusion that at least as now presented, this activated and anguished litigation should not have been concluded by summary judgment. Consequently, I dissent.

